JAMES TILMON, Plaintiff-Respondent-Counterpetitioner-Appellant, *v.*
LOUISE IRENE TILMON, Defendant-Petitioner-Counterrespondent-Appellee.

Second District   No. 78-365

Opinion filed July 2, 1979.

Foos, Meyers and Jacobs and Gary E. Dienstag, of Haas and Dienstag, both of Chicago, for appellant.

Fred A. Geiger, of Finn, Geiger and Rafferty, of Waukegan, for appellee.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

This is an appeal from the order of the trial court in a post-decree proceeding in which the court (1) held James Tilmon in contempt of court and fined him $1,000 for failure to comply with the court's previous decree regarding alimony payments; (2) denied James Tilmon's cross-petition for child support from his ex-wife, Louise, and (3) assessed the wife's attorney fees against Tilmon in connection with the post-decree hearing.

The Tilmons were married in 1959 and divorced in 1975 on the ground of mental cruelty. They have three children who, at the time of the hearing, were 18, 16 and 15. The divorce decree awarded custody of the two younger children to Louise and provided she was to receive $1,000 per month for 10 years as alimony in gross and $250 per month for the support of each child, as well as the benefit of certain insurance policies.

Tilmon was remiss in the payment of the decreed alimony from time to time and in September 1975, after a rule to show cause was issued against him, the court, while not finding Tilmon in contempt of court, entered an order providing that he comply with the letter of the decree. In January of 1976, Tilmon again being late in making alimony payments, another petition for a rule to show cause was filed by Louise Tilmon, as the result of which the court entered an order which in part provided that Tilmon was to make all future payments of alimony by mail postmarked no later than the fifth day of each month.

In April of 1976, Tilmon petitioned for a change of custody of the two younger children from Louise to him, which was eventually granted in October of 1976, and child support payments to Louise were terminated at that time.

On June 27, 1977, Louise filed another petition for a rule to show cause, alleging that Tilmon had failed to make the June alimony payment by June 5, as required by the decree. It appears from the testimony adduced at the hearing on the rule to show cause that Tilmon had requested that Louise furnish him the birth certificates of the two younger children, which she had failed to do, and he had informed her that he would, therefore, not make the June alimony payment. This does not appear to be a valid reason to withhold or delay payment, inasmuch as birth certificates are public documents, just as available to James Tilmon

as to his divorced wife. The June payment was, in fact, made on June 29, after the petition for rule to show cause had been filed. Louise did not withdraw her petition after the payment was made and a hearing thereon was set for August 18, 1977. On July 22, respondent Tilmon filed an answer and a cross-petition in which he sought child support from petitioner, Louise. Thereafter, the petitioner amended the petition for rule to show cause, alleging that payments provided for in the decree had not been timely made for the months of February through May 1977, and the June payment was not made until the rule to show cause had been filed.

At the hearing, which was actually not held until April 1978, Louise produced evidence of late payments in several months previous to June 1977, beginning, in fact, in January of 1976. Since the rule to show cause had not specified such months previous to February 1977, the trial court sustained Tilmon's objection to the inclusion of such checks as not having been pleaded in the petition. In that hearing, Tilmon attempted to introduce matters in mitigation of the contempt arising out of the late payments of February through May 1977. However, petitioner's counsel objected, saying that such matters had not been set up in the respondent's answer and he should be bound by the pleadings in that regard as petitioner was bound by lack of pleading and denied the opportunity to bring in the late checks, prior to February 1977, into evidence. The trial court sustained petitioner's objection in this regard, which is assigned as error by the respondent. The trial court found the respondent Tilmon in contempt of court and fined him $1,000.

The main question in this case, however, is the court's ruling on the respondent's (Tilmon's) cross-petition for child support from the petitioner which was denied, the court finding "a lack of need on the part of James Tilmon and lack of ability on the part of Louise Irene Tilmon to contribute to their support."

In support of his cross-petition for child support from Louise, respondent invokes section 505 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1977, ch. 40, par. 505), reading as follows:

"In a proceeding for dissolution of marriage or legal separation or declaration of invalidity of marriage, or a proceeding for child support following dissolution of the marriage by a court which lacked personal jurisdiction over the absent spouse, the court may order either or both parents owing a duty of support to a child of the marriage to pay an amount reasonable and necessary for his support, without regard to marital misconduct, after considering all relevant factors, including:
(1) the financial resources of the child;
(2) the financial resources and needs of the custodial parent;

(3) the standard of living the child would have enjoyed had the marriage not been dissolved;

(4) the physical and emotional condition of the child, and his educational needs; and

(5) the financial resources and needs of the noncustodial parent or parents."

Relying on this language noted above—which appears to be a codification of the case law as reflected in recent cases (see *Hursh v. Hursh* (1975), 26 Ill. App. 3d 947; *Plant v. Plant* (1974), 20 Ill. App. 3d 5; *Flatley v. Flatley* (1976), 42 Ill. App. 3d 494), Tilmon argues in this appeal that the court erred in considering only the disproportionate income of the two parties, thus basing its order solely on Tilmon's ability to pay for the children's expenses without reference to Louise's just obligation to contribute according to her ability.

In none of the cases cited by Tilmon have we found a situation even remotely resembling that of the case before us. In *Hursh*, a father having income of $16,000 gained custody from the mother, whose income was $20,000. The father petitioned for contribution from the noncustodial mother and the trial court denied his petition. The appellate court reversed, saying that the circumstances of both parties should be considered in determining what arrangements as to support would be reasonable and proper. We do not doubt the justice of that decision, but the circumstances are the opposite to those found before us, since in that case the noncustodial wife had a larger income than the custodial father.

*Plant* is apparently cited by Tilmon only for the general language leading up to the decision of the specific issue, where the appellate court said:

"In our opinion the support of a child is a joint and several obligation of both husband and wife, the amount and source thereof to be determined on the basis of the needs of the child and the means and capacity to produce income of the respective parents." (20 Ill. App. 3d 5, 7-8.)

Actually, however, the husband in that case had no income, he being an incompetent and supported out of an inheritance of $40,000 left to him which was administered by a conservator. Thus, the court, in spite of the philosophy indicated above, refused the wife's petition for contribution from the incompetent's husband's estate. This case, cited purely for the general language, is not dispositive of the issue at hand and clearly has no relevance to the case before us.

*Flatley*, while a case where the husband had a much larger income than the wife—$76,000 as compared with her $16,000—is concerned only with the cost of college education. The wife had agreed beforehand to

share the cost of her daughter's college education but the husband thought he was entitled to a greater contribution from the wife for this cost than the court allowed him, which was about one-fourth of the total education cost. The appellate court affirmed the trial court. Since both parties had agreed to be responsible for the college education of their daughter, the decree seems fair enough—it was the husband who protested the division and his objection was based on two other factors than proportional income; (1) that he had not been consulted about the choice of college and (2) that some of the regular support money he was paying should have been set aside for college expenses. Both contentions were rejected by the appellate court. Obviously, this case has little or no bearing on the case we consider here.

Other cases cited by respondent are likewise inapposite in their facts to the unusual case before us. See *Sullivan v. Sullivan* (1978), 57 Ill. App. 3d 958; *Matthews v. Matthews* (1976), 42 Ill. App. 3d 1049; *Killinger v. Killinger* (1976), 40 Ill. App. 3d 962.

Obviously, we do not take issue with the general proposition that each parent should contribute to the children's support, as stated in the recent cases and as enunciated in the Illinois Marriage and Dissolution of Marriage Act which specifies that the court, in making support awards, shall consider: "the financial resources and needs of the noncustodial parent * * *." (Ill. Rev. Stat. 1977, ch. 40, par. 505(5).) However, the courts have approached the problem of joint support on a realistic and flexible basis, having regard for the actual needs and abilities of the respective parties in maintaining a proper amount of support for the child—the approach being one of preventing injustice and assuring continuity and adequate support for the child, rather than that of establishing a mathematical formula based entirely on net annual income. See *Plant* and *Flatley*, cited above.

The untraditional idea that the mother, as well as the father—even where she is a noncustodial parent—may be obliged to contribute to the support of the minor children of the couple evolved from practical considerations. It greatly enlarged the basis of the minor's support in an economy where many women have incomes from wages or salaries. It is therefore a principle which should not be divorced from practical considerations, and while the symmetry of the law may be enhanced by a consistent deference to guiding rules and principles, questionable results cannot always be condoned for the sake of vindicating a general rule. In the case before us it can be argued, with some credibility, that Louise Tilmon had an income of around $27,000 per year and being a single woman she therefore had ample margin above her living needs to allow a certain amount of support of her minor children—or those who were

minors at the time of the hearing. On that basis she should be required to contribute a certain proportion of her income, proportionate to the joint total income of the parents.

Isolated from all other factors which bear on the problem of child support, this is a persuasive argument. Looked at as a part of the total picture presented by the testimony at the hearing, however, the argument for contribution from Louise is much less impressive. The hearing was held in April 1978, so the last complete preceding year was 1977. James Tilmon testified that his income for 1977 consisted of $84,626 from NBC; $49,763 from American Airlines; $41,407 from Tilmon Productions and $2,500 from Pyramid Trotting Association for a total of $178,296. While his testimony indicated that Tilmon Productions was not expected to do the same volume of business for 1978 as for 1977, it was still functioning and no precise figure for 1978 was stated. Tilmon did testify that for the second half of 1978 his salary from NBC would be increased $10,000 from $95,000 to $105,000 annually. We cannot speculate on what is not in the record before us, but it is apparent that Tilmon's 1978 total income will be over $150,000 and may be substantially more.

According to the tenor of Tilmon's argument Louise, therefore, should make a contribution roughly in proportion to the percentage which her gross income bears to the total combined incomes of herself and Tilmon, perhaps one-seventh of the total cost of the minors' support. The difficulty of obtaining a meaningful figure in this way is at once illustrated by such technical considerations as the treatment of alimony, since what is income to Louise is a deduction for Tilmon and likewise he reserves the credit for deductions which Louise does not have. However, besides such technical difficulties, which could no doubt be adjusted with the help of lawyers and accountants, there are three fundamental considerations which, in our opinion, render such an approach in this case unrealistic and unjust. These are, first, the differences in living standards between the households of the two parents; second, the enormous difference in "disposable" or "excess" income between the two parents and, third, the nature of about 45 percent of Louise's income—that is alimony in gross, payable in installments and terminating in 10 years from the date of the decree—actually seven or eight years from the date of the hearing in question.

Tilmon's testimony and the basis for the claim for support from Louise was that the expenses of the children were around $27,300 per year and Louise should pay a proportionate share of that. The formula devised by his attorney is self-defeating, for it would have Tilmon paying $21,600 per year while Louise would pay around $5,700, which, as a proportion, is obviously absurd. Using the 1977 figures, which are for the last complete year available, Louise would pay around $4,000, even without considering

the advantage to Tilmon of taking the children as dependents. However, the fundamental and self-serving error in this calculation is the astonishing figure of $27,300 for the cost of child support. Bearing in mind that James Tilmon was 15 years old in 1975 and was close to emancipation at the time of the hearings in April of 1978, it is obvious that we are concerned over a period of the next several years only with Thera, who was 17 and John, who was 15 at the time of the hearing. In other words, during the next few years, Louise, in any event, would have had only two children who could legally require her support. That the support of these two children could be calculated at $27,300 per year is absurd on its face. In 1975, when the divorce property settlement was made, Tilmon was required to pay $250 per month for each child for support, or $6,000 per year for the two children in Louise's custody. In addition, he was to carry insurance, but obviously the cost per child would not have exceeded $300 per month or $7,200 per year for the two younger children. Even allowing for inflation, the figure of $9,000 would seem adequate on that basis. This, of course, does not include the cost of private tuition at Country Day School for John and Thera, or tuition for James at Harper College. However, these are not legal obligations of Louise as a mother, however appropriate they might be for James Tilmon to make for his children in view of his income and position. James Tilmon, in his testimony, related some of his expenditures on behalf of the children, and it is obvious that they are not on a basis of necessity but of luxury. The children had each received expensive hi-fi equipment costing $800 to $1,000 and they were each given $30 per week spending money or $90 per week for the three children, which totaled $4,860 annually for the item of spending money alone. Tilmon's house has eight or nine rooms "not counting the den and baths" and has a current market value of $180,000. Thera and James each had their own car, purchased by their father. The children also took vacations with their father, which is entirely legitimate, but may also be expensive. All in all, we can readily accept the figure of $27,300 for expenses in connection with the children—what we do not accept is that an ordinary working mother should bear a proportionate share of such expensive living. In short, Louise has a very limited amount of "disposable" income—income not needed for living expenses or for a reasonable surplus against contingencies, whereas Tilmon can much more easily adjust his scale of living, if necessary.

■ Moreover, while the $1,000 per month over a 10-year period, which Louise was receiving as alimony in gross, is technically to be treated as income and subject to income tax, it is certainly not ordinary income in the sense of earnings or income from investments because it has a definite termination date, and it would be appropriate to expect that a part of such income should be treated as capital and put aside as savings against

contingencies which might arise in later years because of illness or unemployment. In addition, there is something incongruous in requiring a part of a settlement of alimony in gross to be extracted from the recipient in the form of child contribution by the parent who appears to have encouraged the change of custody of the minors by making available to them a higher standard of living than the other parent could possibly afford. We think this creates an illogical situation which is beyond the general intent of section 505 of the Illinois Marriage and Dissolution of Marriage Act. Therefore, while acknowledging the validity of the general proposition that parents are both to some equitable extent obligated for the support of their minor children, we find the circumstances of the case before us to be such that it is not necessary or desirable to apply this principle as requested by James Tilmon in this case.

■■ Two other points remain to be considered. Tilmon contends that his conviction for contempt should be reversed because he was denied an opportunity to explain the circumstances of his default in making timely payments of alimony. We think, however, that the respondent was not disadvantaged by this as much as he contends. While generally speaking a person has the right to be heard in mitigation or explanation of alleged contemptuous conduct, the respondent in this case was not actually foreclosed from making some reference to certain domestic difficulties which contributed to his failure to make timely payments. Such references were actually made by him and they applied to dates previous to June 1977. Tilmon acknowledged in his testimony that he had a specific reason for failing to make the June payment—which was that he was not going to do so until Louise sent him the birth certificates of the younger children. The previous delay may have been for reasons which would be considered mitigating circumstances, but they suggested a pattern of reluctance to obey the court's order after the initial occasion which prompted the court to impose a deadline in mailing the alimony checks. Nor are we favorably impressed by the sequence of events which preceded Tilmon's counterclaim for support, since we must agree with the contention that it was brought as a countermeasure to Louise's pursuance of the contempt citation, rather than from economic necessity for contributions from Louise. We are, therefore, not inclined to reverse the court's judgment imposing a fine of $1,000 on Tilmon. Some sanction was certainly in order because of his June default, and considering Tilmon's income, a lesser amount would have seemed pointless. Moreover, it would appear that the colloquy between counsel which triggered the judge's ruling on this point gives some basis for the contention that the rule as to additions and amendments to the pleadings not being allowed was first suggested by respondent's counsel. We are not persuaded that respondent was unfairly treated under the circumstances.

■ We have very carefully considered the question of attorney fees. It is true that Louise was not without funds to pay her own attorney, and under some circumstances she should have been required to do so. In the case at hand, however, the occasion for being in court seems to have emanated from Tilmon's default in making the June payment and, in fact, he did not make that payment until the rule to show cause had been issued. The aftermath, in the form of a counterclaim appears, as we have indicated, to be without substantial basis in economic necessity. Tilmon sought the custody of the minors and could well afford to support them, not only in a normal but in a luxurious style. Thus, the time spent in court by Louise's counsel in combating the counterclaim for support may, we think, be reasonably viewed as the responsibility of the respondent Tilmon. The trial judge appears to have given careful consideration to the claim for attorney fees and to have reduced it to a reasonable amount. We cannot see that there was any injustice to Tilmon, under the circumstances, in imposing on him the necessary costs incident to this litigation.

The judgment of the circuit court of Lake County is affirmed.

Judgment affirmed.

NASH and LINDBERG, JJ., concur.