*In re* MARRIAGE OF ANDREA SCHUSTER, Petitioner-Appellee and Cross-Appellant, and ALAN SCHUSTER, Respondent-Appellant and Cross-Appellee.

Second District   No. 2—90—1256

Opinion filed February 4, 1992.

Ilene E. Shapiro, of Chicago, for appellant.

Timothy M. Daw, of Schiller, DuCanto & Fleck, of Chicago (Sarane C. Siewerth, of counsel), for appellee.

JUSTICE WOODWARD delivered the opinion of the court:

Respondent, Alan Schuster (Alan), appeals from certain portions of the judgment which dissolved his marriage to petitioner, Andrea Schuster (Andrea), who cross-appeals from certain portions of that judgment.

The parties were married on July 31, 1977. Two children were born to the marriage, namely, Charlie, born April 19, 1982, and Aaron, born July 3, 1986. The parties were awarded joint custody of the minor children.

Both parties are college educated. Andrea received a B.S. degree in education from the University of Wisconsin. Alan received a B.S. degree in metallurgical engineering from the University of Wisconsin. In addition, Alan received a J.D. degree from IIT/Chicago Kent law school and was licensed to practice law in 1980. Alan's law school education was financed through joint marital earnings and a student loan. In addition, Alan's parents gave him $5,000 which was used to make partial repayment of the student loan.

After being licensed to practice law, Alan worked for two law firms and did legal work on the side. Alan then went to work for Cozzi Iron and Metal as in-house counsel. By 1987, his salary from Cozzi had risen to $80,000 gross per year, and he earned $20,000 by practicing law on the side. By 1987, Andrea, who had begun working for Metropolitan Structure in 1981, was a senior vice-president. Her income is made up of a base salary plus commission. In 1986, she earned in excess of $168,000.

During the summer of 1987, Alan announced that he wished to begin trading commodities. According to Andrea, she was agreeable if it meant Alan would finally be happy doing this type of work. She felt he should try it for a year, which Alan thought was a reasonable amount of time. After the stock market crash in the fall of 1987, she asked Alan to defer his plan for a year, but he assured her that this was a good time to get started in commodities. From their joint funds, Alan took $60,000 which he needed for the security account he was required to keep and another $15,000 to $20,000 to start trading with. According to Andrea, after Alan started trading in January 1988, he would periodically be frustrated with that, and she would remind him that he had agreed to give trading a year's time.

In March 1988, the parties first discussed getting a divorce. It was not discussed again until August 1988. In September 1988, Andrea initially filed a *praecipe* for dissolution of the parties' marriage in Cook County. The cause was transferred to Lake County. Andrea filed a petition for dissolution of marriage in December 1988, and Alan filed a counterpetition for dissolution of marriage in September 1989. The grounds of irreconcilable differences were not contested. Custody and visitation issues were uncontested. The cause went to trial on the issue of division of marital property, spousal and child support and attorney fees. No issue is raised as to the award of attorney fees.

Each party presented an expert witness as to the value of the marital residence located at 1740 Rosemary, Highland Park, Illinois. Fred Eichmann testified on behalf of Andrea. He holds a B.S. degree in investment management, an MBA in finance from Northwestern University and an SRA (senior residential appraiser) designation, meaning that he has had the training to specialize in residential appraisals. He has been appraising real estate for over six years and has done thousands of appraisals. He appraised the property at 1740 Rosemary at $255,000 fair-market value.

Eichmann testified further that the marital residence was a 14-year-old bi-level with six rooms, including three bedrooms and two

baths above grade (above ground level). The residence also had a family room on the lower level (the level just below ground level) and a subbasement lower than the family room. In arriving at the appraised valuation, Eichmann utilized three comparables. The first one was three-quarters of a mile away from the marital residence, was of a similar age and lot size and had a recreation room in the lower level. It sold for $250,000. The second comparable was one-fourth of a mile away and sold for $251,500 in July 1989. It was 20 years old and a two-story colonial, but Eichmann was of the opinion that, with the proper adjustments, it was a good indicator of the value of the marital residence. The third comparable was over a mile away from the marital residence, but Eichmann testified that he selected it because it was a tri-level style, which had similar functional utilities with the multilevel aspects. It differed from the marital residence in that it had a family room at grade level behind the garage and there was a subbasement somewhat in the style of the marital residence under the second level. The third comparable sold for $282,500.

Eichmann further testified that he calculated the gross living area of the marital residence to be 2,075 square feet above the grade. He established the first comparable to have 2,050 square feet of living space and the second comparable to have 2,300 square feet. The gross living area of the third comparable was 2,980 square feet, which he derived from information from the Society of Real Estate Appraisers.

Eichmann testified that he had reviewed the comparables relied on by William Schwandt, Alan's appraiser. The first was located at 337 Sumac, Highland Park. It was a 1920 vintage Tudor-style home. According to Eichmann, he would not have used it as a comparable since older homes have superior construction. The second comparable was located at 1505 Ridge, Highland Park, and was a 1920 vintage center entrance colonial or Georgian style. Although the Ridge home was updated, Eichmann would not have used it as a comparable because there would be considerably more depreciation in an older home than a new one.

On cross-examination, Eichmann testified that the marital residence did not appear to have been decorated in some time and that the appliances appeared to be the originals, although the washer and dryer might be newer. He estimated that the Sumac and Ridge properties were within a mile of the marital residence. Eichmann explained that although he had deducted points in his appraisal based upon the gross living area and the number of rooms, this was not a double deduction, but rather a splitting between the square footage and how he considered the house function. He agreed that the lower

level contained a fireplace, a half bath and would be considered a family room rather than a den. According to Eichmann, an MAI designation was higher than an SRA.

On redirect examination, Eichmann testified that his appraisal would not be altered if the trim of the marital residence had been painted in the beginning of 1989. According to Eichmann, the difference between the MAI and SRA designation was that an MAI was qualified to do industrial and commercial appraisals. He described the marital residence as in very average condition.

William Schwandt testified on behalf of Alan. He has been in real estate since 1946 and has an MAI designation, which he received in 1971. He valued the marital residence at $315,000.

Schwandt testified that in arriving at the value he used the aforementioned properties on Sumac and Ridge and a third property located six blocks northwest of the marital residence in Deerfield. He felt proximity was an appropriate criteria for a comparable. Although his comparables were two-story, not bi-levels, there were few bi-levels in Highland Park. He felt the Sumac and Ridge properties were comparables to the marital residence because even though they were older, they had been updated as had the marital residence.

On cross-examination, Schwandt testified that he had not observed any paint chipping or flaking of the exterior of the marital residence. In choosing his comparables, because of the lack of bi-level-style houses in the area, he, theoretically, cut the marital residence in half and raised one half of it and, then, found comparables. Schwandt agreed that the Sumac property, which sold for $305,000, had a total of 3,364 square feet. According to Schwandt, he would make adjustments due to the variance in square footage but that the adjustments were subjective.

Linda Sizemore, a clinical psychologist, testified that she began treating Alan in September 1988. She diagnosed Alan as suffering from obsessive compulsive personality disorder and depression. Although the depression immediately stems from the dissolution proceedings, Alan has a history of depression. According to Dr. Sizemore, Alan has a great deal of difficulty functioning occupationally because of his depression. He suffers from sleeplessness, fatigue, irritability and anxiety, and he has an inability to concentrate. Alan remains under her care.

On cross-examination, Dr. Sizemore testified that she did not know for how long Alan had suffered from depression, but it was present during his marriage. Other than the dissolution proceeding,

Alan's difficulty with his father also triggered periods of depression. Also, difficulties with his employment triggered depression periods.

Dr. Sizemore testified further that therapy-wise Alan is in much the same place as he was in September 1988. He has not emotionally separated from his wife and has not been able to move on. While Dr. Sizemore believed that once the dissolution process was over it would be easier for Alan to move on, he moves more slowly in his therapy than most people do.

Dr. Sizemore testified further that Alan's depression affects his ability to function as a commodities trader since he has difficulty concentrating. Alan and she determined that he should give trading a chance when he had his full power of concentration before he determined whether it was the right occupation for him. According to Dr. Sizemore, a depressed person can continue to work.

Dr. Sizemore further testified that prior to July 1989 Alan showed small improvement in relating to his children. After July 1989, Alan showed a little improvement. She has never recommended career counseling for Alan.

Andrea testified that Alan and she were married on July 31, 1977. They then moved to Chicago, where Alan attended law school. Andrea worked as a receptionist at the Michigan Avenue Club. In 1982, she was working for Metropolitan Structures as a leasing agent. The parties' first child, Charlie, was born in 1982, and their second child, Aaron, was born in 1986.

Andrea described her responsibilities as those of the traditional wife-mother, taking care of her children, shopping, meal preparation and cleaning the house, in addition to her job. Alan handled the family finances, did maintenance work around the house and fixed the cars, in addition to his employment.

Andrea further testified that in 1987 the parties discussed Alan's desire to trade commodities. She indicated to Alan that, if such a move would make him happy, he should do it. She also informed him that, after a reasonable time had passed, she would take time off from work and spend it with their children. Alan began his trading, using their joint funds. When Alan became frustrated with trading, Andrea told him that he had to give it a year. Although divorce was mentioned in March 1988, it was not discussed again until August 1988. They separated permanently in July 1989.

Andrea further testified that, during their marriage, Alan controlled the finances. During the marriage, they took two vacations and did not go out to dinner except to fast-food restaurants. Prior to 1988, they had not gone out to a movie, but had rented them, at first

from a video store, but then from the library because Alan did not like spending the money to rent them.

Andrea further testified that since early 1988 she has been paying all of the children's expenses. A couple of times Alan has paid for the children's tutor and bought them toys. She also had the marital residence painted and purchased a new stove with Alan's approval. She also replaced the washer and dryer.

On cross-examination, Andrea testified that her current salary at Metropolitan Structures is $56,000, plus commission. She also receives medical and hospitalization benefits and a retirement plan. The company also put a telephone in her car. Her accountant projected her 1989 income to be $150,000. However, that included commission on a lease which has now fallen through. Since Alan changed careers, she has been the "breadwinner" in the family.

Andrea testified further that in their discussion in March 1988 Alan had told her he did not want to live his life "without passion" and suggested a divorce. However, when she filed for divorce in September 1988, Alan expressed surprise and indicated he wanted to save the marriage.

Andrea testified further that Alan had had problems over the years in dealing with his family, especially his father, and with being successful due to his feelings of rejection from the family business, as well as his identity. He saw Dr. Greenberg. After a few sessions, Alan told her Dr. Greenberg thought he was schizophrenic. Andrea also noted that Alan had had 8 jobs in 11 years. She admitted to being resentful of the fact that Alan had had the ability to change jobs whenever he wanted to if he was not happy with what he was doing. On the other hand, she had had no choice but to work where Alan wanted her to work.

On redirect examination, Andrea testified that she was not aware that Alan received any money from his parents to pay for his law school education. According to Andrea, since the dissolution proceedings were begun, Alan has improved and had told her that he is happier than ever.

Alan testified that, at the present time, he is a futures trader at the Board of Trade in Chicago. At the present time, his seat rental is $150 per month. He plans to rent a GIM or GIAM seat, which would allow him to trade treasury bonds. Alan made an offer of proof that such seats rent for $2,200 to $2,500 per month.

Alan testified to the jobs he held following his graduation from law school in 1980. He first worked for Simmons Refining Company, performing administrative functions, as well as buying and selling fu-

tures contracts on the Comex exchange. He then worked for two law firms, but left in 1983 because he did not like the work, and then for Cozzi Steel & Metal as in-house counsel. In the summer of 1986, Alan first mentioned to Andrea that he was interested in trading for a living. Again in fall 1986, he mentioned to Andrea that, because of difficulties at Cozzi Steel & Metal, he thought it would be a good time to make the move to trading. According to Alan, Andrea encouraged him. Following the stock market crash in fall 1987, Andrea expressed doubts as to whether, given the stock market crash, it was a good idea to go into trading. Alan explained that due to the number of traders leaving the business, he would have a better opportunity starting now. According to Alan, Andrea said, "Go for it."

Alan testified further that he began the trading in January 1988. In March 1988, he expressed to Andrea that perhaps he should reconsider trading, to which she replied that he never committed to any one thing long enough and that he had to give it at least one year. According to Alan, Andrea encouraged him to stick with trading. In September 1988, after Andrea had filed for divorce, she closed the bank accounts and cancelled his credit cards. When he asked her how he was supposed to live, she suggested he close his trading account and live on that. When Alan told her he needed the money in the trading account for security, she told him to find "a real job."

Alan testified further that certain of his trading losses were related to the dissolution proceedings. He lost $4,800 in August 1988 when Andrea informed him she wanted a divorce. He lost $2,500 during the first three months of 1989 while they were having custody disagreements. He lost $1,500 in September 1988 when he was moving out of and subsequently back into the marital residence. In August 1989, he lost $1,000 when he moved out of the marital residence for the second time.

Alan testified further that he studied engineering in college because his father thought it would be a good background for him in the family business. In his senior year, his father informed him that there would not be a position available for him in the family business, although after he graduated from law school, he worked for his father as a salesman for three months. He did not wish to return to practicing law because he could not handle the pressure. He did do some legal work for friends.

Alan testified further that, in 1986 when Andrea had an opportunity to change jobs, he advised her to do what she thought best but that he thought the move would be great for her. Six months later, when Andrea received another job offer, he told her the same thing.

Alan further testified that in September 1988 he purchased a new 1988 Audi. Andrea at first told him to buy a used car but then stated that he should go ahead and buy it as long as it cost less than her car. Alan also received $60,000 as of July 17, 1989, by court order as an advance against his share of the marital property. It was now down to $50,000. The money was spent for living expenses, bills and some of the children's expenses. He received a loan of $2,500 from Schuster Metals in December 1988 after Andrea closed the joint bank account.

On cross-examination, Alan testified that the parties own a condominium which is presently rented out for $760 per month on which the monthly assessments are $280 per month. He acknowledged that in July 1989 a court order was entered requiring him to pay the rental check to Andrea and that, after the assessments were paid, the balance was to be deposited into a joint account. Alan admitted that he never gave the rent checks to Andrea and never deposited them in a joint account, as required by the court order. Alan also admitted paying $950 per month for six months for the rental of a house he never lived in.

Alan testified further that after Andrea closed the joint account he lived off funds he maintained in a separate account. However, he could not recall how much money was in the account when he started to draw down on it for living expenses and for certain of the children's expenses. The parties did stipulate that Andrea had paid the majority of the children's expenses. Alan also admitted that he also used the rental funds from the condominium to pay his expenses.

Alan further testified that in 1987 when he was working for Cozzi Steel & Metal he was earning $80,000 per year and paying his own expenses, as well as contributing to the family expenses. In January 1988, the parties had approximately $150,000 in savings accounts and in cash. He has made no efforts to obtain full-time employment as either an attorney or engineer since January 1988, although he does practice law on a part-time basis.

Alan testified further that his monthly expenses are $4,627, although at the present time he does not make or spend that much each month. He expected to pay the expenses from savings and working full time. He disagreed that the parties' lifestyle was fairly modest but described it as "upper middle class yuppy-type." According to Alan, the parties vacationed every other year in Florida, Mexico or local places. It was his impression that the $60,000 he received via the court order was for living expenses. He admitted taking vacations by himself to Club Med and a skiing vacation in 1989. The trips were paid for with his credit cards.

On redirect examination, Alan testified that he did not live in the home he rented for $950 per month because he moved back to the marital residence following his initial departure. He expected to receive rehabilitative maintenance from Andrea to cover those of his expenses that are not covered by savings or working.

Alan testified further that Andrea would deliver the condominium assessment notices and he would pay them. He has not pursued a position as an attorney because he cannot handle that type of job and it is not in his or his children's best interests. He never liked engineering as a profession. He enjoys what he is doing now.

Both parties then rested. A hearing on attorney fees was then held.

By letter dated November 15, 1989, the trial court rendered its decision. Only those provisions relevant to the issues raised on appeal will be noted. The trial court denied Alan's request for rehabilitative maintenance, finding that, although he has an engineering degree, as well as a law degree and a history of gainful employment, he had declined to secure a job paying a regular income. Moreover, the trial court found that, although Alan suffered periods of depression, the evidence did not support a finding that his depression or any other medical condition prevented him from maintaining employment.

The trial court divided the marital property as follows: $211,123 to Alan and $345,083 to Andrea. In addition, Andrea was ordered to pay $75,000 to Alan in order to effect the trial court's intent to award more of the property to Alan due to his weaker financial position. The issue of child support was reserved, in view of Alan's negative cash flow and Andrea's current ability to meet the needs of the children. In valuing the marital residence at $255,000, the trial court found Andrea's expert to be more persuasive. In the division of the marital property, the trial court credited Alan with the rent from the parties' condominium, as well as the six months of rent at $950 per month, which he paid for the house he did not live in.

Prior to the entry of the judgment for dissolution of marriage, Alan filed a motion for reconsideration. The trial court ordered the judgment entered, allowed Alan to file his motion and ordered Andrea to file a response to the motion. Andrea filed a response to the motion for reconsideration and filed her own motion for reconsideration. Alan also filed a motion to vacate the judgment for dissolution of marriage alleging that Andrea had fraudulently misrepresented her earnings for 1989.

After considering all motions, the trial court amended the judgment as follows: the sum of $75,000 which Andrea was to pay to Alan

was increased to $98,500 to effectuate a division of 55% of the marital estate to Alan; the rent Alan paid for the house he did not live in was not to be considered dissipation; and the net condominium rental credited to Alan was increased to $2,500 to reflect Alan's failure to account for the condominium rental receipts from July to November 1989. The trial court found that Alan was able to support himself in the manner consistent with the standard of living enjoyed during the parties' marriage. Certain other modifications to the judgment were made in response to Andrea's motion for reconsideration, but they are not the subject of this appeal.

On July 24, 1990, a hearing was held on the issue of Alan's child support obligation. Based upon his past employment history, the trial court imputed to Alan a net income of approximately $70,000 and ordered Alan to pay the sum of $1,000 per month, there being sufficient reasons to deviate from the statutory guidelines. The trial court further ordered that Andrea make an initial payment of $50,000 to Alan of the $98,500 owed to him under the judgment and, thereafter, pay the balance of $48,500 in monthly installments of $1,000 until the entire sum is paid. The child support order was subject for review in August 1995. This appeal by Alan and cross-appeal by Andrea followed.

Alan contends, first, that the trial court's failure to award him rehabilitative maintenance was against the manifest weight of the evidence.

"A court may award maintenance only if a spouse: '(1) lacks sufficient property, including marital property apportioned to him, to provide for his reasonable needs, and (2) is unable to support himself through appropriate employment * * *, or (3) is otherwise without sufficient income.' " (*In re Marriage of Seymour* (1990), 206 Ill. App. 3d 506, 509-10.) The policy underlying maintenance awards is that a spouse who is disadvantaged through marriage be enabled to enjoy a standard of living commensurate with that during the marriage. (*In re Marriage of Hackett* (1986), 113 Ill. 2d 286, 294.) A spouse cannot use self-imposed poverty as a basis for claiming maintenance when he has the means of earning more income. (*Seymour*, 206 Ill. App. 3d at 510.) The Illinois Marriage and Dissolution of Marriage Act (Act) creates an affirmative duty on a spouse requesting maintenance to seek and accept appropriate employment. (206 Ill. App. 3d at 510.) An award of maintenance to a spouse capable of improving his income can be an abuse of discretion. 206 Ill. App. 3d at 510.

■ The record in this cause does not support an award of rehabilitative maintenance to Alan. At the time of these proceedings, Alan

was 32 years of age. He possesses a college degree in engineering, albeit he disliked engineering as a profession. He also possesses a law degree, but he was unhappy practicing law. He does enjoy his work as a commodities trader but has not as yet been financially successful at it. We note that many of Alan's trading losses occurred during the time of strife in the dissolution proceedings. These proceedings coming to an end should eliminate those periods of otherwise unexplained losses. We further note that, throughout the hearings in the cause, as well as his brief, Alan emphasized that he not only held full-time demanding jobs but also worked at night doing legal work on the side. Regardless of whether he enjoyed it or not, this demonstrates that he is capable of such employment as will enable him to continue to enjoy the lifestyle he had during his marriage to Andrea. Finally, Alan emphasized that he suffers from a history of severe depression and an obsessive compulsive personality disorder and that his progress in therapy was slow. Dr. Sizemore testified that Alan's ability to concentrate and to work was affected by his condition. However, while she did not know how long Alan had been suffering from these conditions, Alan had worked continuously and made a good income until he began trading. Moreover, Dr. Sizemore testified that such conditions did not render people incapable of work.

Alan's reliance on *In re Marriage of Teauseau* (1989), 185 Ill. App. 3d 22, is misplaced. In that cause, the appellate court reversed a four-year award of maintenance holding that the award of maintenance to the wife should be reviewed periodically rather than automatically terminated at the end of four years. The wife was 46 years of age and had graduated from high school and beauty school. She had not worked for 25 years and suffered from depression. Other than the fact that Alan also suffers from depression, we find no similarities between this cause and the cause at bar.

In *In re Marriage of Magnuson* (1987), 156 Ill. App. 3d 691, also relied on by Alan, the court stated that where the spouse seeking maintenance can *in part* provide for herself, the amount of the maintenance award shall be determined by subtracting from the standard of living what the spouse can contribute to her own support. In the cause at bar, the record shows that Alan is capable of supporting himself without the assistance of Andrea, unlike the wife in *Magnuson*.

Finally, Alan relies on *In re Marriage of Seymour*. In that cause, the wife, who had a college degree and a teaching certificate, was pursuing a career as a Congregational minister which would pay a lower salary. This court affirmed an award of $750 in maintenance on the basis that her degree was 18 years old, she had never been

paid as a teacher and her rent was $675 plus $91 for utilities. The maintenance was ordered reviewed at the end of 30 months. In contrast, Alan has continuously practiced law, albeit part time, and has proved capable of meeting his own needs, without Andrea's assistance.

We conclude, therefore, that the trial court correctly denied Alan's request for rehabilitative maintenance.

Next, Alan contends that the order requiring him to pay $1,000 per month in child support was an abuse of the trial court's discretion.

Alan argues that the trial court made its decision on child support using financial information from the dissolution proceedings rather than granting his motion to compel Andrea to produce current information on her income, asset holdings and liabilities and expenses for herself and the children. Andrea did furnish him with a current pay stub from her employment reflecting her cumulative earnings through mid-July 1990.

Section 505(a)(1) of the Act requires that the court use the statutory percentages as guidelines in determining child support. In this cause, the parties have two children, and the guideline percentage is 25%. (Ill. Rev. Stat. 1989, ch. 40, par. 505(a)(1).) Section (a)(2) further provides that these guidelines should be followed unless the court, taking into consideration relevant factors, finds a reason for deviating from the guidelines. Among the factors are the financial resources of the child; the financial resources and needs of the custodial parent; the standard of living the child would have enjoyed had the marriage not been dissolved; and the financial resources and needs of the non-custodial parent.

The hearings in this cause which culminated in a judgment for dissolution of marriage ended in November 1989, and a judgment for dissolution of marriage was entered. Six months later a hearing on child support took place. At that hearing, the trial court explained that the focus of the hearing was not on Andrea's assets, since the trial court was already familiar with the parties' respective assets, how the marital estate was divided and how visitation with the children was arranged. The delay in settling child support was to give Alan time to improve his cash flow, and, therefore, the sole focus of the hearing was Alan's ability to make child support payments.

■ We are satisfied that, given the relatively short period of time between the entry of the judgment and the hearing on child support, as well as the familiarity of the trial court with this cause and its stated purpose for the hearing, Alan was only prevented from inter-

jecting irrelevant issues into a hearing, the focus of which was solely his ability to pay child support.

Alan also argues that the trial court improperly attributed a net income of $70,000 to him even though he had made a "good faith" career change which was not intended to evade his financial responsibility to his family.

In determining whether a change in status was made in good faith, the crucial consideration is whether the change was prompted by a desire to evade financial responsibility for supporting the children or otherwise jeopardize their interests. *In re Marriage of Hardy* (1989), 191 Ill. App. 3d 685, 690.

Alan relies on *Hardy, In re Marriage of Webber* (1989), 191 Ill. App. 3d 327, and *In re Marriage of Kowski* (1984), 123 Ill. App. 3d 811. In *Hardy*, the court found that an employment layoff and an attempt to become self-employed were not attempts to evade financial responsibilities. In *Webber*, the husband reduced his employment hours and returned to school in order to provide himself with greater earning potential. The reviewing court upheld the trial court's decision not to increase child support payments as requested by the wife. In *Kowski*, the husband sought reduction of his maintenance payments based upon his voluntary taking of new employment which paid substantially less than his prior employment. The reasons for the change included new owners of the company for which he worked who had increased his work load without increasing his salary and that this placed his health in jeopardy. Although the trial court denied his petition to reduce, the reviewing court reversed and remanded the cause, determining that there was no evidence showing his new employment was to evade his financial responsibilities.

Alan first made the decision to become a trader in 1987 and started trading in January 1988, prior to even a discussion of a dissolution of the parties' marriage. The parties agreed that Alan would give trading a year. By the time of the hearing on child support, Alan had been trading for over two years without any appreciable success, although he had proved himself financially successful in other employment endeavors. The trial court had given him an additional six months after the entry of the judgment to adjust his cash flow. Moreover, Alan's explanation for not practicing law or pursuing an engineering career boiled down to the fact that he does not "like" either of those careers. Alan has not been fired from any job, been passed over for promotion or overworked to the point of his health suffering. He continues to trade because he "likes" it. Nevertheless, from the record in this cause, it is apparent that Alan's initial decision to be-

come a trader was agreeable to Andrea. In fact, when Alan became discouraged by his lack of success at trading, Andrea encouraged him to stick with it. The fact that he has not been financially successful at it would be significant only if there was evidence that he entered into trading with the desire to evade his financial responsibility to his family or otherwise jeopardize their interests. There is no such evidence in this cause.

Generally, the trial court is in a much better position to make findings as to whether a change in occupation was in good faith. (*Hardy*, 191 Ill. App. 3d at 690.) We sympathize with the trial court's dilemma in this cause given the evidence that Alan had been financially successful in other employment endeavors. However, given the fact that Alan entered into trading with Andrea's consent and prior to any discussion of dissolving their marriage, we must conclude that the trial court abused its discretion in finding that Alan's career change to trading was not in good faith and in attributing a $70,000 annual net income to him.

Alan finally argues that he should have been excused from paying child support altogether based upon Andrea's income and economic self-sufficiency. Alan relies on *In re Marriage of Reed* (1981), 100 Ill. App. 3d 873, and *Tilmon v. Tilmon* (1979), 74 Ill. App. 3d 111.

In *Reed*, the reviewing court upheld the trial court's decision not to require the noncustodial mother to contribute child support for five children in view of her age, lack of training and poor income-earning potential. In *Tilmon*, this court upheld a trial court decision not to require the noncustodial mother to pay child support where the father's income was in excess of $150,00 per year and the mother's was $27,000, $12,000 of which was alimony.

The support of a child is the joint and several obligation of both the husband and the wife. (*Tilmon*, 74 Ill. App. 3d at 114.) We find the case of *In re Marriage of Rai* (1989), 189 Ill. App. 3d 559, to be instructive on this issue. In that case, the wife, a physician, earned in excess of $200,000 per year. The husband had several degrees in engineering but left that field to assist the wife in running her practice and invested in several restaurants. The reviewing court noted that the husband's income from the restaurant business was far from clear since he operated on a cash basis and his tax returns did not support his testimony. The reviewing court stated as follows:

> "[Wife] also contends that the trial court erred when it failed to determine [husband's] obligation to support the parties' two minor children. We agree. Although we are remanding the cause in order that [wife] may receive a more favorable distri-

bution of the marital assets, it is apparent that [husband] will still receive an award sufficient to support himself and at the same time make a contribution to the support of his children. Moreover, [husband] is an engineer who worked in that field from 1965 to 1975. In 1975, he chose to stop working in the field where he received several degrees and had 10 years' experience. While [husband] offered evidence that he was unemployable, he also agrees that a father must recognize his obligation to contribute to the support of his children when he has the ability to do so. [Husband] also asserts that he has worked all his life and will continue to do so. We do not believe that because children receive adequate support as a result of one parent's efforts the other parent is excused from all obligations of support. We direct that the trial court determine the amount of child support [husband] is required to pay." *Rai*, 189 Ill. App. 3d at 570-71.

At the hearing on child support, Alan testified that in a six-month period he generated $8,212 in income while incurring $26,262 in expenses resulting in a negative cash flow of $3,000 per month. Alan also testified that roughly $1,800 of his monthly expenses were for the two minor children. He arrived at this amount by dividing his expenses for such things as housing, utilities, insurance, food and clothing on a one-third/two-thirds basis. Alan further testified that he covered the monthly deficit by taking funds out of his checking account or his money market account. He acknowledged that due to the division of assets he will have access to $284,000, including his $60,000 brokerage security account. He testified that he regarded the monthly negative cash flow as "a cost of doing business in the transition associated with this divorce."

■ Alan is neither unemployed nor unemployable and fully capable of contributing to the support of his children. Other than Andrea's financial success, Alan has not demonstrated any basis to support his conclusion that he should not have to pay child support. As was the case in *Rai*, Alan's award of marital assets is sufficient to support himself and, at the same time, make a contribution to the support of his children. Therefore, we remand this cause to the trial court for the purpose of conducting a hearing to determine the amount of child support Alan should pay, taking into consideration all of the relevant factors.

Next, Alan contends that the trial court abused its discretion in the division of the marital property.

Alan argues that the trial court erred in establishing a "child support trust" where there was no showing that it was necessary to set aside a portion of his marital property in trust to protect and promote the best interests of the children. Although we are remanding this cause for a new hearing on child support, our discussion of this issue may further guide the trial court in its consideration of the child support issue.

Section 503(g) of the Act permits the establishment of a separate fund or trust for the support of the minor children only if necessary to protect and promote the best interests of the children. (Ill. Rev. Stat. 1989, ch. 40, par. 503(g); see also *In re Marriage of Bush* (1989), 191 Ill. App. 3d 249; *In re Marriage of Bates* (1986), 141 Ill. App. 3d 566; *In re Marriage of Atkinson* (1980), 82 Ill. App. 3d 617.) However, the record in this cause does not reveal that the trial court established a "trust" for the support of the minor children.

■ In the judgment for dissolution of marriage, the trial court ordered as part of the division of the marital property that Andrea pay the sum of $98,500 to Alan. The payments were structured to provide that Andrea pay the first $50,000 in a lump sum to Alan and, thereafter, $1,000 per month to Alan until the balance of $48,500 was paid in full. Conversely, Alan was ordered to pay the sum of $1,000 per month in child support to Andrea. Although Alan categorizes these provisions as a "wash," nothing in the language of the judgment relieves one party from making the required payment, even if the other party fails to make his or her required payment, nor is there any language in the judgment describing a trust for child support. Moreover, the judgment further provided that the $48,500 would bear interest at 9% per annum, and nothing prevents Andrea from paying the $48,500 or any part thereof in one lump sum to avoid the interest payment. We, therefore, conclude that contrary to Alan's assertion the trial court did not create a child support trust.

Alan also argues that the trial court erred in refusing to include Andrea's "undisclosed" income and EEOC settlement in the division of the marital property. He maintains that the trial court's expressed intentions to divide the marital estate 55% to Alan and 45% to Andrea was defeated by the trial court's treatment of certain of Andrea's assets not disclosed at trial.

Alan argued in his motion to vacate that, during the dissolution proceedings, Andrea led the trial court to believe that her gross income for 1989 would be $150,000 when, in fact, her W-2 for 1989 showed gross income of $174,398.31. Actually, Andrea testified that her accountant had projected her 1989 income to be $150,000, and she

had produced a paycheck stub which showed her earnings through September 10, 1989.

■ We note that neither party's income was included in the calculations of the marital property. Moreover, the trial court expressly stated that it took the points raised in Alan's motion to vacate into consideration in reassessing the money Andrea was to pay to him. Alan has not therefore established a right to an additional sum of money based upon Andrea's income for 1989.

Alan further argues that he is entitled to 55% of an EEOC settlement Andrea received. Alan claims he is entitled to 55% of the net settlement amount of $3,369 or $1,853.

Alan concedes that the EEOC settlement was received by Andrea in March 1989. According to Andrea, the settlement amount was deposited in a savings account and, thus, already divided by the trial court in the judgment for dissolution of marriage. The judgment in this cause was entered on December 15, 1989. The trial court disposed of the parties' motions for reconsideration and Alan's motion to vacate by order of April 25, 1990. On June 4, 1990, Alan filed a motion for reconsideration of the April 25, 1990, order in which, *inter alia*, he alleged that Andrea had not disclosed the EEOC settlement. On July 24, 1990, the trial court granted Andrea's motion to strike Alan's motion for reconsideration on the basis that the EEOC settlement could have been raised in Alan's earlier motion for reconsideration.

Alan claims he was not aware that Andrea had received the EEOC settlement until April 25, 1990, when Andrea produced her 1989 tax return during the hearing on attorney fees. He further claimed that it was Andrea's lack of candor, not his lack of diligence in conducting discovery, that prevented him from raising the issue before.

■ Assuming, *arguendo*, that Alan was not aware of the existence of the EEOC settlement until April 25, 1990, the fact that he did not receive $1,853 would not substantially affect the distribution scheme intended by the trial court, and, on that basis, we will not disturb the trial court's ruling.

Next, Alan contends that the trial court erred in adopting the opinion of Fred Eichmann, Andrea's expert as to the value of the marital residence.

Conflicts in testimony concerning valuation of assets in an action for dissolution of marriage are matters to be resolved by the trier of fact, and, so long as the valuation of the court was in the range testi-

fied to by the expert witness, it ordinarily will not be disturbed on appeal. *In re Marriage of Weinberg* (1984), 125 Ill. App. 3d 904, 909-10.

Alan criticizes Eichmann's appraisal for characterizing the lower level rooms as "basement" rooms in calculating living space and for deducting value because the house had not been painted "in a while" and had not been updated when, in fact, certain appliances had been replaced and the exterior had been painted. He also pointed to the fact that his expert, William Schwandt, had 31 years' experience, as well as an MAI designation. He also criticizes the comparables chosen by Eichmann.

■ Since the MAI designation refers to the ability to appraise commercial property, it is of little distinction here where the property is residential. Although Eichmann had been doing appraisals for six years, he testified that he had done thousands of them. He characterized the lower level rooms as "below grade," yet in calculating the total living area, he had 2,075 square feet of living area as opposed to Schwandt's 1,947 square feet of living area. Moreover, Schwandt himself testified that, in order to value the house, he treated it as though it had been cut in half and the lower level raised to create a fictional two-story house, with no basement or a ranch-style with a basement. Although certain appliances were new and the house had been recently painted, Eichmann's testimony was based on how the home appeared to him. Finally, the comparables used by Eichmann were chosen because of their resemblance to the marital residence, as opposed to Schwandt, whose comparables were closer in location but were older and bore no real resemblances to the marital residence.

We therefore conclude that the trial court did not err in adopting Eichmann's appraisal of the marital residence.

Next, Alan complains that his receipt of $60,000 by order of court in July 1989 was improperly credited against his share of the marital property. He argued that since he had to spend approximately $10,000 of that money for ordinary living expenses, as well as certain of the children's expenses, the entire $60,000 should not have been credited to him as part of the division of the marital property.

In his brief, Alan recites the language of the order, however, leaving out certain significant language. The order including the language omitted by Alan (emphasis added) in his brief reads in pertinent part as follows:

"(2) That Alan Schuster shall be provided with the sum of $60,000 from the assets of the parties *for the purposes of and only for the purposes of, buying a residence in the Highland Park area or for the renting of an apartment, condominium or*

*residence.* Said funds shall be an advance against any and all property which will be eventually distributed to Alan Schuster pursuant to any judgment of dissolution of marriage entered in this matter either as a result of a trial or by agreement." (Emphasis added.)

Alan conceded that the trial court was aware at the time of the property distribution that he had utilized the money to pay living expenses.

■ We fail to follow Alan's argument on this point. The language of the order is clear that the $60,000 would be credited against his share of the marital assets. The fact that he chose to utilize the money other than as divided by the court does not change the fact that he, not Andrea, had control of the money and spent it as he saw fit. Since the payment of rent or purchasing a house is a "living expense," the fact that he used the money to pay "living expenses" does not require a different result.

Finally, Alan complains that the trial court erred in finding that he had dissipated $2,500 in rental proceeds for the parties' Sandburg Terrace condominium.

Alan admitted that he was required by court order to turn the net proceeds over to Andrea to be deposited in a joint account. He further conceded that he did not do so, but argues that he did not because Andrea had closed the parties' joint accounts. He asserts that he paid the monthly assessments and used the remaining rental money to pay for his personal expenses.

Dissipation of marital assets occurs when a spouse (1) uses marital property (2) for his or her own benefit for a purpose unrelated to the marriage (3) at the time when the marriage is in serious jeopardy or undergoing an irreconcilable breakdown. (*In re Marriage of Getautas* (1989), 189 Ill. App. 3d 148, 152.) Once it is established that one party has liquidated marital assets, the party charged with dissipation must establish by clear and specific evidence how the funds were spent. (*In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 550.) Where a party has dissipated marital assets, the court may charge the amount dissipated against his or her share of the marital property in order to compensate the other party. *In re Marriage of Block* (1982), 110 Ill. App. 3d 864, 870.

■ There is no dispute that the rental proceeds were marital property and that the marriage was in serious jeopardy at the time Alan was collecting and spending the rental proceeds. Alan sought to account for the rental funds by testifying that these funds went for the living expenses of himself and the two minor children. However,

there was a stipulation that Andrea paid for the majority of the children's expenses since before the parties' separation. Although Alan's check register was admitted into evidence, it primarily reflects credit card payments and payments to his attorney. Failure to explain specifically how money in exclusive control is spent requires a finding of dissipation. (*In re Marriage of Los* (1985), 136 Ill. App. 3d 26, 32; see also *In re Marriage of Harding* (1989), 189 Ill. App. 3d 663, 677 (bare assertions by petitioner that funds from the trust account were used to pay necessary expenses during dissolution proceedings permitted a finding of dissipation).) Given that the trial court heard Alan's rather vague testimony as to how he spent the rental proceeds and was also in a position to consider the check register, we have not been convinced to overturn the trial court's finding of dissipation.

A property division can be disturbed only upon a showing of an abuse of discretion, which occurs only when no reasonable person would take the view adopted by the trial court. (*Partyka*, 158 Ill. App. 3d at 550.) The reviewing court may not substitute its discretion for that of the trial court. (*Partyka*, 158 Ill. App. 3d at 550.) Under these standards, we hold that the trial court did not abuse its discretion in the division of the marital property.

We now turn to the issues raised by Andrea in her cross-appeal.

Andrea contends, first, that the trial court erred in failing to hold Alan accountable for $27,500 he received during the pendency of the proceedings. According to Andrea, Alan had $23,042 in his solely titled First Chicago account when the parties separated in 1988, yet at the time of trial the account held only $1,500. In addition, Andrea argues that the trial court did not take into account the fees Alan collected from his law practice.

Andrea filed a motion to reconsider the April 25, 1990, order which increased from $75,000 to $98,500, the amount of cash Andrea was to pay to Alan. In that motion, Andrea did not raise any issue as to the funds in Alan's First Chicago account or the sums Alan had received from his law practice. In response to Alan's second motion for reconsideration, Andrea filed a motion to dismiss but indicated in the motion that should the trial court reopen the cause to consider the issues raised in Alan's motion for reconsideration, then she would request the trial court to reconsider the issue of Alan's First Chicago account and his receivables. The trial court denied Alan's motion for reconsideration and, therefore, never considered Andrea's dissipation argument as to the above monies.

Questions not raised in the trial court are deemed waived and may not be raised for the first time on appeal. (*Western Casualty*

& *Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 500.) Moreover, it is quite possible that since the trial court did not find dissipation as to these funds, unlike the condominium rental, then the trial court accepted Alan's explanation of these expenditures from living expenses for himself and the minor children. Therefore, we will not disturb the trial court's finding in this regard.

■■ Andrea also argues that the trial court's division of the marital property on a 55% to 45% basis was an abuse of discretion. After reviewing the record in this cause, and given the respective financial positions both present and potential of the parties, we cannot say that no reasonable man would arrive at the decision reached by the trial court in this cause. (*Partyka*, 158 Ill. App. 3d at 550.) We therefore find no abuse of discretion on the part of the trial court.

With respect to the award of child support, the decision of the circuit court is reversed, and this cause is remanded for a hearing in accordance with the views expressed in this opinion. The remaining portions of the judgment are affirmed.

Affirmed in part; reversed and remanded in part.

McLAREN and INGLIS, JJ., concur.