*In re* MARRIAGE OF CHARANJEET RAI, Petitioner-Appellant, and KRISHAN D. RAI, Respondent-Appellee.

First District (6th Division)   No. 1—87—3562

Opinion filed September 29, 1989.

William Harte, Ltd., of Chicago (William Harte, of counsel), for appellant.

Joel Ostrow, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

The trial court dissolved the 13-year marriage of petitioner, Dr. Charanjeet Rai (the wife), and respondent, Krishan D. Rai (the husband), and following a bench trial, determined their property rights. Petitioner appeals, contending that the trial court erred in awarding an inequitable distribution of marital property in favor of respondent, who made little or no homemaker or financial contribution, and who dissipated the marital assets; that the trial court erred in failing to determine respondent's obligation to support the parties' two minor children; and that the trial court abused its discretion in ordering petitioner to pay a portion of respondent's attorney fees. Petitioner asks this court to enter judgment in her favor for an amount "significantly more than 50% of the marital assets," or in the alternative, to remand for a new trial on all issues.

The parties were married on May 24, 1970, in India. Petitioner is a licensed physician, specializing in obstetrics and gynecology, earning over $200,000 per year at the time of the 1983 dissolution of marriage. Respondent has several degrees in engineering, but has not worked in that field since 1975. Instead, he claimed some part in running petitioner's medical practice, and he invested in several restaurants, which allegedly brought him a net income of $4,800 during the entire period of their marriage.

The parties' daughter, Tanya, was born June 1, 1973, and a son Erik was born January 1, 1975. Petitioner filed for dissolution of the marriage on June 17, 1982. She retains custody of the minor children, and neither the dissolution nor custody is an issue in this case. Petitioner alleged in her petition for dissolution that respondent dissipated the marital assets and should receive no portion of the marital estate. On October 12, 1983, the trial court granted a bifurcated judgment for dissolution of marriage and reserved all remaining issues for trial. The trial took place over a two-year period, involving 19 days of hearings. Both sides offered evidence as to their marital assets; their respective efforts in caring for the children and home; their respective financial contributions; and respondent's dissipation of marital assets.

On October 15, 1986, the trial court rendered an oral decision on the remaining bifurcated issues. On February 6, 1987, the court entered an order relative to valuations of the marital assets. On April 2, 1987, a supplemental judgment for dissolution of marriage was entered.

On October 27, 1987, the trial court entered a final order, distributing the property as follows:

To Respondent:

1. Oak Brook home, including the debt thereon. (Value per respondent: $117,931; value per petitioner: $91,533; value per court: $104,732.) This home was built in 1981 for investment purposes and for use on weekends by petitioner and the children.

2. Petitioner would pay Oak Brook home's mortgage principal, interest, taxes and insurance for three months following entry of trial court judgment. Upon sale of this home, respondent could keep a net distribution of $370,000.

3. Pension Accounts—one-half interest, not including the Keoughs or IRA's transferred to avoid current tax consequences to petitioner. (Value per respondent: $232,680; value per petitioner: $114,000; total value as of October 12, 1983: per court $247,000.)

To Petitioner:

1. Lake Shore Drive Condominium. (Value per respondent: $166,000; value per petitioner: $150,000; value per court: $158,000.) The court found this was the family home where petitioner and the minor children resided.

2. Keough Plan and IRA's. (Value per respondent: $46,815; value per petitioner: $35,200; value as of October 1983, per court: $35,200.)

3. Automobiles, furniture, furnishings and jewelry in her possession and including the contents of both homes. (Value per respondent: $172,100; value per petitioner: $50,000; minimal value per court: $100,000.)

4. Stocks and Bonds. (Value per respondent: $99,700; value per petitioner: $12,500; minimum value as of October 1983, per court: $12,500.)

5. Medical practice, as nonmarital property. (Value per respondent: $150,000; value per petitioner: $40,000 to 60,000; value per court: $70,000.)

6. Oak Brook home. Petitioner will retain a lien on any amount in excess of a net distribution to respondent of $370,000, after deducting costs of sale.

7. Pension accounts—one-half thereof.

In regard to the dissipation of marital funds, the court found on April 2, 1987, that "neither party has dissipated the marital property." In its memorandum of opinion, the court found that respondent's investment in a vending machine business and in restaurants may have been unprofitable, but did not amount to dissipation. Such business ventures were considered, however, in assessing respondent's contribution to the acquisition of marital assets.

In regard to respondent's contributions as a homemaker, the court found that his contributions were not so minimal or negative to preclude him from any significant share in the marital estate. The court went on to state: "[t]he fact that Dr. Rai's income has generated all of the assets acquired by the parties since 1975 together with the fact that she has been the sole financial support of the minor children of the parties since that time, equitably requires that she receive a significantly greater apportionment of the marital assets." The court further stated "[d]ue to Dr. Rai's superior capability to acquire future assets and income, Mr. Rai is entitled to a[n] equitable share in the marital assets." The court originally directed petitioner to pay her husband monthly maintenance but, noting among other things that respondent had remarried prior to the supplemental judgment, ordered that petitioner was not required to pay maintenance to her husband.

In regard to child support, the trial court found that petitioner had been the sole economic support of the children since 1975. "[D]ue to the economic circumstances of Mr. Rai, it cannot be anticipated that any monetary support contributions from him will be forthcoming in the foreseeable future." The trial court reserved the issue of respondent's payment of child support.

In regard to attorney fees, the court found that in light of his

property award, respondent had a substantial capacity to pay attorney fees and costs. The court held, however, that in view of petitioner's property award and greatly superior earning capacity, it was appropriate that she pay $65,000 of respondent's attorney fees and costs.

Petitioner contends that the trial court abused its discretion when it inequitably distributed marital property in favor of respondent. Petitioner points to the factors of respondent's lack of contribution either financially or as a homemaker; respondent's dissipation of assets; and respondent's employability and opportunity for future acquisition of assets and income.

From our view of the record, we agree with the trial court that because of respondent's contribution as a homemaker, he was entitled to a significant share of the marital assets. Both sides offered detailed testimony as to whether respondent made a contribution as a homemaker. Petitioner offered strong evidence that respondent made no contribution as a homemaker. Yet the court's finding that respondent's contribution as a homemaker was not so minimal or negative as to deprive him of a significant share of the assets is not against the manifest weight of the evidence. We also agree with the trial court's determination that because she generated all of the marital assets and was the sole support of the minor children, petitioner would receive a significantly greater apportionment of the marital assets.

Petitioner argues, however, that despite its statement, the trial court did in fact distribute the marital property in favor of respondent. Petitioner maintains that respondent received over 50% of the assets, urging that she received an award of $364,200 while respondent received $558,000.

■ We find that we cannot resolve that issue because of the apparent unresolved conflict as to the value of the Oak Brook property. Petitioner submitted a figure of $91,533 as its net equity. Respondent submitted a figure of $117,931 as its net worth, but testified that the property had a net worth of $900,000. The trial court found that the property had a net worth of $104,732, but ordered that petitioner retain a lien on any amount in excess of a net distribution to respondent of $370,000, after deducting costs of sale of the Oak Brook property. In view of the obvious uncertainty of that valuation, we cannot determine whether the trial court distributed the marital assets in favor of respondent. We find, however, that the trial court erred in holding that respondent had not dissipated marital assets. Consequently, the matter must be remanded in order that the trial court may grant a greater share of the marital assets to petitioner in light of that dissipation.

■■ ■ Dissipation has been defined as one spouse's use of marital property for his or her own benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irreconcilable breakdown. (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866.) A party can be found guilty of dissipation even though the act occurred prior to separation or prior to the commencement of the dissolution proceedings. (*In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008; *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 426 N.E.2d 1087.) Whether a given course of conduct constitutes dissipation depends upon the facts of each case. (*In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 509 N.E.2d 707.) The explanation given by the spouse charged with dissipation as to how funds were spent requires the trial court to determine his or her credibility. (*In re Marriage of Lord* (1984), 125 Ill. App. 3d 1, 465 N.E.2d 151.) Where the funds are spent for legitimate family expenses, and necessary and appropriate purposes, there is no dissipation. (*In re Marriage of Sevon* (1983), 117 Ill. App. 3d 313, 453 N.E.2d 866.) The spouse charged with dissipation of marital funds has the burden of showing, by clear and specific evidence, how the funds were spent. (*In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008.) If expenditures are not documented adequately by the person charged with dissipation, courts will affirm a finding of dissipation. (*In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008.) General and vague statements that funds were spent on marital expenses or to pay bills are inadequate to avoid a finding of dissipation. (*In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 507 N.E.2d 207.) Whether there was dissipation is a matter for the trial court's discretion, and a finding concerning dissipation will not be disturbed unless it is against the manifest weight of the evidence. (*In re Marriage of Ryman* (1988), 172 Ill. App. 3d 599, 527 N.E.2d 18.) In the present case, we believe that the trial court's finding of no dissipation is against the manifest weight of the evidence.

Initially, we observe that strong evidence was presented that the marriage began breaking down in 1976. Navas testified that the marital relationship was not good during the mid-1970's. Dr. Williams testified for petitioner that the marital difficulties were obvious in 1976. Dr. Ilahi testified that the marital breakdown was obvious in the mid or late 1970's. Petitioner testified that the marital problems had been ongoing since 1976. There is sufficient evidence that the breakdown began in 1976.

In April 1976, respondent went into the restaurant business. He

owned and operated the Green Garden Mandarin Restaurant, but never received any income from that restaurant. In 1978, respondent formed a corporation to open the Copa Casino restaurant (later called the Tropic Zone). The bartender and waiter ran it until October 1980, when respondent began to run it. In 1984, respondent made $7,000 from the restaurant, all in cash. Respondent had worked as an engineer from 1965 to 1975. In 1975 he chose to stop working in that field.

With regard to concealment, dissipation and the purpose of his many expenditures, we note that respondent testified that he was also known as "Chris," or "Krishan." He had no account in another name. Having so stated, he then admitted having one account in the name of "Rai K. Dave" and one in the name of "Dave K. Rai." Respondent could not explain why the bank used those names on at least 20 statements over a three-year period. Although respondent never supplied those names to the bank, he signed those names on checks. Respondent used separate accounts in order to keep track of how much money he was losing in Green Garden.

Respondent testified that deposits to his account came from selling stock out of the parties' "Merrill-Lynch joint account" or from "the [medical] business—personal joint account." He would transfer it into his single account. Petitioner could not write checks on the single account. Respondent then took petitioner's salary from the joint account and placed it in his separate account. Respondent did not remember if he asked her. The funds from his separate account were rarely used for anything but respondent's restaurant business.

From 1978 through 1982, the two restaurants earned gross receipts of $40,000 to $70,000. He paid the employees out of those receipts. He paid the employees by check until 1982, when he began paying them in cash. Respondent made deposits, and he kept some of the money. He placed the money in the "Rai K. Dave" account. He never gave any of the funds to his wife or the children.

Stuart Levin, an accountant testifying for petitioner, offered significant information regarding funds earned in respondent's restaurant businesses. Levin testified that $190,000 in "loans" were repaid to respondent from the businesses. In addition, the restaurant tax returns were not prepared properly. A missing $250,000 was needed to make the returns balance properly. Either income was understated or the amount which respondent used to fund the business was understated by $250,000. Also, while there were heavy losses, there was no indication of where the money came from to fund those losses, i.e., the source of the funds used to operate the businesses on a continuing

loss basis. On the returns, in 1979 "all of a sudden, all this past money missing *** magically appears on a return in one year." Levin could not determine whether the missing $250,000 came from loans to the businesses by respondent, or "whether it was unreported receipts." It was impossible for Levin to evaluate the restaurant businesses.

Levin also noted that the reported wages paid to employees were extremely low. For example, in fiscal year ending 1981, the restaurant paid $1,420 in wages. Even at minimum wage, the figures averaged out to 300 hours per year, which would mean less than one hour of work a day per person.

Petitioner testified that respondent often told her that the restaurants were earning money. He brought home $500 to $1,000 in cash each night, and would put it in a safe deposit box. In 1977 or 1978, he told her that $30,000 was stolen from a box he kept in the restaurant. Respondent told her many times that he made $100,000 to $150,000 in cash each year. He also kept cash in the bedroom closet. In 1980, he kept $50,000 there.

Respondent testified that he could have deposited petitioner's public aid reimbursement checks in his account "to use for business purposes if I am losing money." This included a $2,417 public aid check in 1978. Petitioner testified that the check was stamped for deposit in the medical account. That stamp was crossed off, was signed by "Rai K. David," and was deposited into respondent's account.

Respondent often took money from the medical account as his wife's salary and deposited it in his own account. Respondent could not remember what he did with the funds, totalling thousands of dollars, which he took from the medical account by writing checks made out to respondent, signing petitioner's name.

On November 17, 1976, respondent paid $15,000 to one account, and on December 31, 1976, he paid $13,000 to another account, signing petitioner's name to the checks. Respondent testified that the $13,000 went to the pension fund, but petitioner introduced a different check for the same amount, written one day earlier which showed the pension account number. Respondent testified that from the $15,000 check, $5,000 went into the medical account, and $10,000 was used to buy a dining room set. Petitioner, however, introduced photographs which established that the dining room set was purchased the previous year.

Respondent stated that he paid restaurant employees from the medical account as wages for cleaning petitioner's office. Petitioner offered corroborated evidence that no restaurant employee ever

cleaned her office.

Respondent stated that he paid a public relations man several thousand dollars in 1977 from the medical account for both the restaurant and medical practice public relations advice. The medical practice paid for all of it because the medical practice "was benefiting more" than the restaurant. Petitioner offered corroborated testimony that no public relations work was ever done for the medical practice.

Respondent paid electric bills from the medical account, but admitted it could have been for the restaurant since the building in which the medical practice was located included electric service as part of the rent.

Respondent testified that he paid Antonio Salas for painting the medical office, paid Sidney Supply, paid a plumber, and made monthly payments to a heating company, all of which were medical practice expenses. Petitioner testified that she never heard of Salas. Sidney Supply was never used for the medical office. The heating company serviced the air conditioning at her office once, but it was three years after respondent wrote several checks to the company. Petitioner's building provided heat.

Respondent testified that he often took money from the "joint account," which was the account for the medical practice. "I am treating that as a joint account" because it was a "family business which we were doing." Respondent testified that he also kept a safe deposit box from 1975 to 1981. In 1976, he began putting cash from the medical practice into the box.

Respondent also admitted charging things and signing petitioner's name on her American Express account. In 1979 or 1980, he used the account to pay a travel agent for a trip, but took a $2,000 cash refund. Petitioner did not give permission for that transaction. Petitioner testified that respondent did not have permission to use the American Express account.

Respondent testified that he signed his wife's name to checks and documents with her permission:

> "It was the understanding between my wife and myself that Dr. Rai is very, very busy person. So, she doesn't have time to sign and pay whoever comes and looks for Dr. Rai. So, when they come, I just sign it. and I give it to them. Whomever comes. But she has to give me the authority to issue the checks.
>
> ***
>
> Well, when I say authority, it was an understanding between Dr. Rai and me. When Dr. Rai is busy, I take care of her busi-

ness, collect the money, sign the checks when Dr. Rai doesn't have the time."

Respondent initially testified that he made daily bank deposits for the medical practice until 1980 and that petitioner herself made out the deposit slips. He then stated that petitioner only made out the deposit slips when she had time. At his deposition, respondent stated that he had never prepared a deposit slip.

Petitioner testified that she never authorized respondent to sign her name on the medical practice checking account. She first learned of it when her attorney collected documents for the divorce proceedings.

■ We find no evidence that petitioner was an active participant in the manner in which respondent disposed of, concealed and dissipated marital assets. (*Cf. In re Marriage of Ryman* (1988), 172 Ill. App. 3d 599, 527 N.E.2d 18 (husband active participant in wife's purchase of $8,000 car; abuse of discretion to find wife dissipated that asset).) The evidence shows that petitioner, while a physician of some sophistication, had little or no knowledge as to what her husband was doing with the substantial funds she earned. (See *In re Marriage of Petrovich* (1987), 154 Ill. App. 3d 881, 507 N.E.2d 207 (court upheld finding that the husband, a homemaker, dissipated over $2 million of marital assets earned by the wife, a psychiatrist).) An abuse of discretion occurs where no reasonable person would take the view of the trial court. (*In re Marriage of Los* (1985), 136 Ill. App. 3d 26, 482 N.E.2d 1022.) We conclude that the trial court's finding that respondent did not dissipate assets was an abuse of discretion. See *Klingberg v. Klingberg* (1979), 68 Ill. App. 3d 513, 386 N.E.2d 517.

■ Respondent here has failed to establish by clear and specific evidence how the funds were spent or that he used them for marital purposes. (See *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008; *In re Marriage of Greenberg* (1981), 102 Ill. App. 3d 938, 429 N.E.2d 1334.) Respondent gave vague statements that the funds were spent on certain items, but petitioner often established that respondent's testimony was false. Respondent also admitted that he was unsure of where the money went or how the funds were spent.

Respondent has been caught in a dilemma. On the one hand, he has tried to show that he worked hard to run the medical practice, in an unsuccessful attempt to persuade the trial court to find that he had generated marital assets. On the other hand, he has tried to prove he had nothing to do with the operation of the medical practice in an attempt to establish that he could not have dissipated funds, or

that petitioner acquiesced in the alleged dissipation.

Respondent's income from the restaurant business was far from clear since he operated on a cash basis and his tax returns did not support this testimony. Respondent failed to explain the numerous discrepancies in the record. (See *In re Marriage of Cook* (1983), 117 Ill. App. 3d 844, 453 N.E.2d 1357.) Much of respondent's income was unreported and use of that money constituted dissipation. See *In re Marriage of Kaplan* (1986), 149 Ill. App. 3d 23, 500 N.E.2d 612.

After the marital problems became obvious in 1976, respondent concealed, manipulated and dissipated marital funds. (See *In re Marriage of Hellwig* (1981), 100 Ill. App. 3d 452, 426 N.E.2d 1087.) His vague, contradictory explanations for existence and the use of the funds failed to meet the burden of establishing by clear and specific evidence how the funds were spent for marital expenses. (See *In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 511 N.E.2d 676.) Moreover, many of the expenditures were not for marital purposes. See *In re Marriage of Partyka* (1987), 158 Ill. App. 3d 545, 511 N.E.2d 676.

The evidence demonstrates blatant dissipation and complete failure to account for inordinate amounts of missing funds. (See *In re Marriage of Smith* (1984), 128 Ill. App. 3d 1017, 471 N.E.2d 1008.) Respondent was unable or unwilling to explain the losses. His inconsistent, vague testimony was unsupported by any credible documentation. Respondent lied with respect to much of his testimony. He made no substantial financial contribution after early 1975, bringing in only a few thousand dollars in eight years. He diverted many thousands of dollars for his own use, hid assets, and spent huge sums without petitioner's knowledge. Respondent altered financial documents and misled petitioner regarding his income and investments. He deprived the medical practice of great sums of money, and falsified petitioner's name to documents, all while he was allegedly unemployed and earning nothing. See *In re Marriage of Westcott* (1987), 163 Ill. App. 3d 168, 516 N.E.2d 566.

Thus, there is overwhelming evidence of respondent's dissipation of a large portion of the assets earned by petitioner. We believe the trial court failed to adequately consider this evidence in distributing the marital assets. Consequently, we remand the cause so that the trial court may conduct hearings enabling petitioner to receive a greater portion of the marital assets.

Petitioner also contends that the trial court erred when it failed to determine respondent's obligation to support the parties' two minor children. We agree. Although we are remanding the cause in

order that petitioner may receive a more favorable distribution of the marital assets, it is apparent that respondent will still receive an award sufficient to support himself and at the same time make a contribution to the support of his children. Moreover, respondent is an engineer who worked in that field from 1965 to 1975. In 1975, he chose to stop working in the field where he received several degrees and had 10 years' experience. While respondent offered evidence that he was unemployable, he also agrees that a father must recognize his obligation to contribute to the support of his children when he has the ability to do so. Respondent also asserts that he has worked all his life and will continue to do so. We do not believe that because children receive adequate support as a result of one parent's efforts the other parent is excused from all obligations of support. We direct that the trial court determine the amount of child support respondent is required to pay. We reject, however, petitioner's claim that a trust fund be established to insure respondent's payment of child support.

Petitioner finally contends that the trial court abused its discretion in ordering her to contribute $65,000 toward respondent's attorney fees and costs. We agree.

■ Respondent's attorney fees were $154,369 plus costs of $14,190. It is evident that petitioner has the financial means to contribute to those fees and costs. At the same time, respondent will receive funds which will be adequate to pay those fees. Moreover, it was respondent's actions in dissipating marital assets and, more importantly, his concealment of that dissipation which largely contributed to the necessity of those well-deserved fees. We do not believe that respondent should be rewarded by compelling petitioner to contribute to the payment of those fees. We find that the court erred in ordering petitioner to pay this portion of respondent's attorney fees and costs.

For the foregoing reasons, the judgment of the circuit court of Cook County directing petitioner to pay a portion of respondent's attorney fees and costs is reversed. The order distributing the marital property and the order reserving the obligation of respondent's support of the minor children are reversed, and the cause is remanded for further proceedings in accordance with the views expressed herein.

Reversed and remanded.

EGAN, P.J., and QUINLAN, J., concur.