Filed 1/23/08          NO. 4-07-0091

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

In re: the Marriage of          )     Appeal from
MARIA C. ASHER-GOETTLER,          )     Circuit Court of
      Petitioner-Appellant,          )     Woodford County
      and          )     No. 04D64
GOTTFRIED J. GOETTLER,          )
      Respondent-Appellee.          )     Honorable
                )     John B. Huschen,
                )     Judge Presiding.
_____

JUSTICE COOK delivered the opinion of the court:

On June 24, 2004, petitioner, Maria C. Asher-Goettler, petitioned for dissolution of her marriage to respondent, Gottfried J. Goettler. The trial court entered orders dissolving the marriage and entering judgment on all issues. Petitioner appeals those issues dealing with the distribution of property and amount of maintenance. We reverse and remand.

## I. BACKGROUND

Petitioner and respondent were married on October 29, 1991, in Munich, Germany. During the marriage, the couple had two children, Patricia Goettler (born April 14, 1992) and Christoph Goettler (born October 18, 1994). The couple spent the first several years of their marriage in Germany before moving back to Illinois in 1997. During the entire marriage, petitioner worked either as a stay-at-home mother or as a waitress at or manager of restaurants. At the time of the hearing, petitioner

had recently completed a program to become a paralegal and had a part-time job with at a local firm. Except for some period of time in Germany, respondent, who holds a master's degree in physics, was employed in some capacity and was employed at Belcan Engineering Group at the time of the hearings.

On July 9, 2004, an agreed order granted temporary custody of the couple's children to petitioner and granted her possession of the marital residence. The order granted respondent visitation. On July 29, 2004, the trial court entered an agreed order again awarding petitioner possession of the marital residence, rescinding an order of protection against respondent, entering a no-contact order, revising custody to joint temporary custody, and modifying the visitation schedule. Petitioner was not to receive any child support or temporary maintenance but was allowed to maintain and use $8,300 of marital funds that were previously withdrawn from unspecified joint accounts at the time of the separation for her living expenses. Respondent was pro-hibited from claiming dissipation or a credit in the final mari-tal property settlement for these funds provided that petitioner used the funds for reasonable and necessary living expenses only. Respondent was to pay the minimum balance on all marital debts on a temporary basis.

On October 12, 2004, the trial court entered an order denying temporary maintenance and modifying the visitation sched-

ule.

On December 7, 2004, the trial court appointed a child representative and entered an agreed order. The order set temporary child support requiring respondent pay petitioner $100 a week. Petitioner was allowed use of three "ING accounts," which cumulatively had a balance of $4,830, but could use the funds at a rate not greater than $200 a week. Respondent was prohibited from claiming dissipation or a credit in the final marital property settlement for these funds.

On March 9, 2005, pursuant to petitioner's petition for order to show cause, the trial court held respondent in contempt for failure to provide written discovery and fined him $500 for attorney fees.

Per an agreed order entered July 19, 2005, the trial court ordered respondent to pay $250 a week to petitioner for temporary child support, ordered respondent not to increase his credit lines, and ordered that respondent be allowed to use a portion of the marital residence's garage for storage.

After an evidentiary hearing on November 10, 2005, on January 26, 2006, the trial court granted petitioner sole custody of the couple's two children and granted respondent specific visitation.

A hearing on all remaining issues was held on August 3, 2006. Respondent appeared pro se.

Petitioner testified that for the first six or seven years of the marriage in Germany she was primarily a stay-at-home mom but also worked as a waitress for a short time for respondent's brother. When the couple moved to America, petitioner worked primarily as a waitress. Petitioner had a bachelor of arts degree in English from Eastern Illinois University and minors in business administration and German.

Petitioner submitted documents describing all of the assets and debts of which she was aware and supporting documentation for each asset or debt. Petitioner believed the marital residence had a market value of $270,000, a mortgage balance of $75,385, and a home equity loan balance of $49,858. Neither party was living in the marital residence at the time of the hearing. Petitioner requested that she receive the proceeds from the sale of the marital residence. The couple owned a mobile home worth $3,000 that they rented for $576 a month. Petitioner requested respondent retain the mobile home.

Petitioner's car had a value of $745, and respondent's car had a value of $320.

Petitioner submitted that after all debts were paid, including a debt owed to her parents in the amount of $46,746.91 and guardian ad litem (GAL) fees in the amount of $2,865, the marital estate was worth $225,424.66.

Petitioner testified that the money from four ING

accounts, valued at $6,229.73 was spent during the first year of litigation for living expenses. Three of the ING accounts totaling approximately $4,830 were the accounts the court ordered for her use on December 7, 2004. Petitioner claimed that as to the remaining accounts, even if accounts were in her name, respondent controlled all stock accounts, NetBank accounts, ING accounts, investment accounts, and on-line accounts. Petitioner submitted she had nothing to do with any accounts except those she was allowed by court order to use.

Petitioner claimed respondent cashed in a German life-insurance policy receiving $26,000 and giving none of that to petitioner. A second German life-insurance policy valued at $5,000 was not cashed in, and petitioner asked that it be awarded to her because it was her nonmarital property.

Petitioner did not know whether income-tax returns had been filed for 2003, 2004, or 2005 and stated that she received none of the $6,000 refund due for 2002.

Petitioner requested 50% of the marital portion of respondent's German pension.

Petitioner claimed respondent suddenly started contributing funds totaling approximately $7,700 to a church after they separated and that they did not contribute money to a church or go to a church on a regular basis before the separation.

Petitioner submitted a depiction of all the money her

parents loaned her over the past two years for attorney fees, living expenses, tuition for a paralegal program, automobile repairs, and a new washing machine. Petitioner also submitted an itemization of her attorney fees in excess of $24,000. Petitioner submitted a general framework for dividing up all assets and debts and for child support, maintenance, and health insurance. Other than by selling the house, petitioner claimed she had no ability to pay off attorney fees or credit cards if they were assigned to her.

Petitioner believed respondent had bank accounts that he had not disclosed and that he was transferring money out of her ING accounts on a regular basis.

Respondent appeared pro se. Respondent testified the couple made agreements under German law concerning their separate money before they were married. Respondent discussed German contracts the couple made during their marriage while in Germany. Respondent also testified that while he had all the figures regarding assets and debts, he did not have the figures at the hearing. Respondent volunteered to bring them at a later time to work out how to split them evenly. Respondent agreed that the house was worth $280,000 and stated it was the only asset. Respondent agreed his current gross income was $81,848 and that he cashed in a German life-insurance policy in the amount of approximately $26,000. Respondent acknowledged he controlled the

accounts petitioner claimed he controlled and that he used some of the proceeds from the $26,000 life-insurance policy to pay a loan from a colleague.

The trial court took the matter under advisement and on November 28, 2006, entered the final judgment for dissolution of marriage. The court gave petitioner sole legal and physical custody of the children and respondent visitation as shown in attached exhibits. For child support, respondent was ordered to pay $693 every two weeks representing 28% of his net income pursuant to statute.

Each party was awarded life-insurance policies and any cash value in his or her own name. Respondent was to pay petitioner $200 a month as permanent maintenance. Respondent was to pay $4,305.58 to petitioner as a portion of her attorney fees. Each party was to pay half of the GAL fees. Each party was to keep the car in his or her possession.

Respondent was to retain the marital residence and pay petitioner her share of the net equity in the home by paying her $64,502.50 within 60 days. If respondent was unable to secure the funds, the parties must sell the home at $260,000. Each month after listing, the list price is ordered reduced $10,000 until the property is sold. Upon the sale of the home, the parties shall equally share the net proceeds of the sale. Until respondent pays petitioner or the home is sold, respondent is to

make all mortgage, insurance, and real-estate payments.  Respondent retained the mobile home.

Respondent's work 401(k) accounts were to be divided equally.  Petitioner retained the following accounts:

"1.  Bank Plus Checking Account *** with an approximate value of $278.73.

2.  ING Savings Account *** with an approximate value of $2,392.68.

3.  ING Savings Account *** with an approximate value of $1,880.21.

4.  ING Savings Account *** with an approximate value of $558.68.

5.  ING Savings Account *** with an approximate value of $1,398.16.

6.  Vanguard Account *** with an approximate value of $4,229.94.

7.  E*Trade Roth IRA Account *** with an approximate value of $13,726.74.

8.  The children's accounts shall be maintained in the children's names, and under [petitioner's] control."

Respondent retained the following accounts:

"1.  Bank Plus Savings Account *** with an approximate value of $1,047.00.

2.  Bank Plus Checking Account *** with an approximate value of $100.00.

3.  E*Trade Checking Account *** with an approximate value of $602.89.

4.  ING Savings Account *** with an approximate value of $422.68.

5.  ING Savings Account *** with an approximate value of $4,153.28.

6.  ING Savings Account *** with an approximate value of $256.75.

7.  ING Savings Account *** with an approximate value of $766.16.

8.  ING Savings Account *** with an approximate value of $146.40.

9.  ING Savings Account *** with an approximate value of $328.51.

10.  ING Savings Account *** with an approximate value of $24.66.

11.  ING Savings Account *** with an approximate value of $5.86.

12.  E*Trade Stock Account with an approximate value of $25,448.00.

13.  Vanguard Account *** with an approximate value of $1,786.82.

14. E*Trade Money Market Account *** with an approximate value of $2,581.76.

15. E*Trade Roth IRA Account *** with an approximate value of $19,017.21.

16. E*Trade Roth IRA Account *** with an approximate value of $11,122.80."

Petitioner was to pay the following debts:

"1.  Associated Bank Visa Account *** in the approximate amount of $4,658.51.

2.  Capital One TJX Visa Account *** in the approximate amount of $1,350.95."

3.  A.D. Asher in the approximate amount of $46,746.91."

Respondent was to pay the following debts:

"1. American Express Account *** in the approximateamount of $10,901.91.

2.  Bank of America Visa Account *** in the approximate amount of $5,470.00

3.  Capital One MasterCard account *** in the  approximate amount of $1,396.36.

4.  Chase MasterCard Account *** in the approximate amount of $5,122.34.

5.  Chase Amazon Account *** in the approximate amount of $1,882.76.

- 10 -

6. Citi-AT&T Account *** in the approximate amount of $4,754.49.

7. Citi Platinum Account *** in the approximate amount of $10,291.01.

8. Citi-Quicken MasterCard Account *** in the approximate amount of $7,230.41.

9. Citi Platinum Select Account *** in the approximate amount of $3,643.18.

10. Discover Account *** in the approximate amount of $9,007.54.

11. First National Account *** in the approximate amount of $13,449.08.

12. National City Visa Account *** in the approximate amount of $6,830.54.

13. Sears Gold Master Card Account *** in the approximate amount of $4,220.82."

The trial court specifically noted that before the separation, the debts of the parties, aside from the mortgage, were just over $80,000. Two years after the separation, the debts of the parties rose to over $125,000. During the same time, the marital assets fell from $40,482 to $7,489. In addition, petitioner incurred over $40,000 in debt to family members. The court determined that both parties made financial decisions that could be defined as dissipation, including respondent's charitable

contributions totaling $7,700. According to the court's figures, petitioner received $131,181.87 in assets and $52,756.37 in debts with a net asset distribution of $78,425.50. These figures did not count the GAL fees to be split or the $4,305.58 respondent was to pay petitioner for attorney fees. Respondent received $382,600.01 in assets and $289,697.94 in debts with a net asset distribution of $92,902.07. These figures did not count respondent's responsibility to pay the mortgage, insurance, and real-estate payments connected to the house, the permanent maintenance payments of $200 a month, or the child-support payments of $1,386 a month.

After the final judgment was entered, petitioner filed a posttrial motion. In the motion, petitioner included as exhibits copies of bills she began receiving after the trial was completed. Petitioner claimed she had no prior knowledge of the existence of the credit-card debt and respondent had not disclosed this debt in his financial affidavit or trial testimony.

The trial court denied petitioner's motion, characterizing the case as "highly litigated." The court noted that petitioner was now on her third lawyer and respondent went through three lawyers before proceeding pro se. The court acknowledged that petitioner had difficulty obtaining respondent's financial information throughout the proceedings. The court further noted that petitioner's attorney refused to discuss

- 12 -

values and valuation dates with respondent per petitioner's instructions not to speak with respondent unless he agreed to pay her attorney fees. The court felt a meaningful meeting between the parties was impossible and did not require one. The court used petitioner's values and valuation dates and acknowledged possible errors in those values but found petitioner's objection to the values waived as she presented them. Because of "the parties' refusal to cooperate in establishing values and [r]espondent's reluctance to comply with discovery requests," the court determined that it would not "receive any better values then previously received." At the hearing on the motions to reconsider, petitioner could not assure the court she would be able to obtain more accurate values from respondent.

This appeal followed.

## II. ANALYSIS

On appeal, petitioner argues the trial court erred in seven different ways. First, the court erred in its consideration of dissipation. Second, the court's handling of the marital residence was inappropriate. Third, the final order does not include substantial assets and debts, such as German pensions, a loan against respondent's 401(k) plan, and credit-card debts not known at the time of the hearing. Fourth, the court erred in requiring petitioner repay the loan from her parents. Fifth, the maintenance award was insufficient. Sixth, the court should have

- 13 -

ordered child support to be retroactive.  Seventh, respondent should have been required to pay more of petitioner's attorney fees and GAL fees.  Petitioner requests a new trial on all issues other than custody, visitation, and amount of current child support.  Respondent did not file a brief.

We recognize that the parties were not cooperative in working together to determine all marital assets and debts. Because of this, the trial court had a difficult time sorting through the numbers to determine how to equitably divide the marital estate.  On appeal, the main issues include the court's handling of the parties' dissipation of marital assets, the handling of the marital residence, and of the assigning empty accounts to petitioner that the court had previously ordered would be hers for support.  Because of the handling of these issues, remand is warranted.  Upon remand, the court should also address the new marital debts petitioner brought to the court's attention after the final judgment.  The issues connected to maintenance, child support, GAL fees, attorney fees, and the loan to petitioner's parents may be reevaluated once the property distribution is redrafted to comply with this opinion.

A. Dissipation

Petitioner argues respondent clearly dissipated marital assets when he made the following financial decisions:  (1) cashed in a German life-insurance policy worth $26,000 to repay a

- 14 -

friend and pay other vague expenses; (2) spent $6,000 of the tax refund from 2002 without disclosing for what the money was used or giving half to petitioner; (3) donated $7,700 to a church of which he became a member after the couple's separation; and (4) took out a loan approximating $30,000 on his work 401(k) to "refinance high interest cards," for "divorce costs" and for "property tax." She also claims that despite the trial court's statement that "both parties made financial decisions affecting the marital state which could be defined as dissipation," she did not dissipate any funds.

In determining how to divide marital property, the trial court shall consider, among other relevant factors, "the dissipation by each party of the marital or non-marital property." 750 ILCS 5/503(d)(2) (West 2004). "Where a spouse uses marital property for his own benefit and for a purpose unrelated to the marriage at a time in which the marriage is undergoing an irreconcilable breakdown, the court may consider that conduct and compensate the disadvantaged spouse when apportioning the marital property." In re Marriage of Block, 110 Ill. App. 3d 864, 870, 441 N.E.2d 1283, 1288 (1982). Whether the use of marital property amounts to dissipation depends on the facts of the case. In re Marriage of Rai, 189 Ill. App. 3d 559, 565, 545 N.E.2d 446, 449 (1989). If the spouse charged with dissipation cannot show by clear and specific evidence that the funds were spent for a

- 15 -

legitimate family expense, a finding of dissipation is appropriate. Rai, 189 Ill. App. 3d at 565, 545 N.E.2d at 449-50. The trial court's finding regarding dissipation will not be disturbed unless it is against the manifest weight of the evidence. Rai, 189 Ill. App. 3d at 565, 545 N.E.2d at 450.

In this case, the trial court stated that both parties made financial decisions that "could be defined as dissipation" and referred specifically to respondent's $7,700 contribution to a church. The court made no mention of respondent's admission that he cashed in $26,000 in a German life-insurance policy after the separation to pay a "loan" from a "colleague." The court also did not address the missing $6,000 from the 2002 tax refund. Finally, in a posttrial motion, respondent admitted his 401(k) was no longer worth what it used to be. Petitioner argues the evidence shows that the 401(k) plan was initially worth $82,938.46 but is now worth $52,695.53. Petitioner also attached an unfiled, unverified financial affidavit wherein respondent admitted repaying $761.15 a month on the loan from the 401(k) and claimed the loan was used to refinance high-interest cards, for divorce costs, and for property tax. As respondent could not present clear and specific evidence that the funds from the life-insurance policy, tax refund, and 401(k) loan were used for legitimate family expenses, the court's failure to specifically find dissipation regarding these assets was against the manifest

- 16 -

weight of the evidence.

The trial court rightly categorized the $7,700 church contribution as dissipation but did not use the figure when dividing the assets and debts. Presumably, the court did not use the figure because of the vague finding that petitioner also dissipated assets. The record does not show, though, what assets the court considered petitioner to have dissipated. If on remand it can be specifically shown what assets petitioner dissipated, the decision not to use the $7,700 in dividing the assets may be justified. As the record stands now, though, the decision not to figure in the $7,700 dissipation was against the manifest weight of the evidence.

B. Marital Residence

Petitioner argues the trial court made many errors in handling the marital residence. First, the court awarded the residence to respondent despite petitioner's request--to which respondent did not specifically object--that she be awarded the residence. We note that at the time of the hearing, neither party was living in the home and respondent requested that he have permission to live in it. Petitioner agreed that respondent could live in the house.

Second, petitioner claims the trial court used the wrong valuation date in determining her share of the net equity of the home. The court valued the home at $270,000, a price

petitioner presented as the current market value of the home. Respondent agreed the home had a current market value of around $280,000. The court used the mortgage amount from the date of separation, $140,995, resulting in a net equity of $129,005 and her half being $64,502.50. Petitioner argues the court should have used the mortgage amount as of the date of the hearing, $125,243, resulting in a net equity of $144,757 and her half being $72,378.50, which is $7,876 more than respondent was instructed to pay petitioner.

Third, petitioner contends that the system of selling the home if respondent was unable to pay her $64,502.50 within 60 days was detrimental to her. According to petitioner, respondent had incentive to be "unable" to pay the amount and list the house for sale under the court's order. The trial court ordered that the house be listed at a price that was $10,000 less than petitioner stated the house was worth. If the house did not sell the first month, the price of the house would be reduced by $10,000 each month until it sold. Under this scheme, respondent, who was living in the residence, was to make mortgage payments each month, increasing equity in the house. Ultimately, respondent would only have to split the reduced sales price with petitioner. Further, the ordered reduction in price did not account for the possibility of an increasing local housing market. Finally, petitioner argues nothing prevented respondent from avoiding a

sale and then buying the house himself or having another buy the house after the price had been reduced for a few months.

At the hearing, petitioner testified that a realtor told her the most they could sell the house for if everything was fixed up to perfect top-notch condition was $290,000. The realtor warned, though, that because of the number of homes being built in the area, "there is an eight-month supply of brand new homes, and [the Goettlers'] home is in--not in that good of condition." Before the house could be listed, petitioner claimed the realtor said a lot of work needed to be done.

We agree that at the very least, the trial court used improper valuation dates for determining the value of the marital residence. Section 503(f) of the Illinois Marriage and Dissolution of Marriage Act (750 ILCS 5/503(f) (West 2004)) states that "in determining the value of the marital and non[]marital property for purposes of dividing the property," the court "shall value the property as of the date of trial or some other date as close to the date of trial as is practicable." Petitioner testified to the mortgage as of the time trial, but the court valued the mortgage at the date of separation 26 months earlier. This resulted in respondent receiving a larger portion of the equity in the marital residence despite the court's effort to divide the equity 50/50. Thus, the portion of the final judgment distributing the equity in the marital residence was in error and should

- 19 -

be reconsidered on remand.

Also on remand, the trial court should reconsider the method it ordered for the sale of the house should it determine that awarding the home to respondent is still the most equitable decision. The court should consider whether petitioner's argument is legitimate when she contends that respondent may have incentive not to cooperate in securing funds or in selling the home in an effort to reduce petitioner's share of the equity and increase his share.

## C. Empty Support Accounts

The trial court awarded to petitioner three ING accounts, the second, third, and fourth accounts listed above, based on the amount they contained in 2004. The order failed to acknowledge, though, that a previous agreed order awarded those amounts to her for her and the children's support pending the dissolution. Petitioner was not awarded temporary child support or maintenance in exchange for the accounts and respondent was not allowed to argue a dissipation or credit connected to the accounts. The final judgment, though, simply awarded the now empty three accounts to petitioner as part of her property distribution and did not acknowledge that the accounts were empty because they were ordered for her support.

This is clearly an error as the agreed order granting petitioner the accounts specifically stated that respondent was

not allowed to argue a dissipation or credit connected to the accounts. By awarding the accounts to petitioner and considering them part of her share of the marital estate, the trial court implicitly credited petitioner or implicitly found dissipation.

### D. Additional Issues To Resolve on Remand

On remand, the trial court should consider and address the following issues depending on how the court decides to redistribute the marital property.

### 1. Assets/Debts Not Included in Final Judgment

Petitioner argues that the final judgment does not account for certain assets and debts.

First, the judgment does not mention the German pension plans even though petitioner presented paycheck stubs from Germany that she translated to show that 10.15% of respondent's paychecks went into a pension plan. Petitioner asks that if and when respondent receives his pension fund, she be awarded her share of the marital portion. Petitioner has no evidence, though, of what the pension is worth and respondent did not disclose this asset in his financial affidavit or answers to interrogatories. Petitioner also has a German pension plan with some unknown amount in it from before the couple was married that she requests be awarded to her.

Second, in her posttrial motion, petitioner presented the trial court with evidence of three credit cards in her name

that respondent opened, used, and on which he incurred signifi-cant debt, but which were not part of the final judgment. The first account, a Discover account, was one petitioner told the court respondent used and paid, but she was not aware at the hearing that the account had a balance of $9,414.24. The second account was a Discover account of which petitioner had never been aware. She received a statement for the first time after the trial showing a balance of $9,999.89. The third card was a CitiCard account that petitioner did not include at trial because respondent had previously been ordered to pay on the account and all statements had been sent to him. Unbeknownst to petitioner, the account carried a balance of $7,407.20. All three accounts, totaling $26,821.33, are in petitioner's name but, according to petitioner, respondent incurred the debt. As the cards are in her name, petitioner will have to pay them as the judgment did not mention them.

## 2. Loan from Petitioner's Parents

Petitioner took out loans from her parents for her and the children's support after she used all of the money from the ING accounts. The loans also paid for her paralegal training and attorney fees. Petitioner presented a breakdown of what portion of the loan went to perceived "family support," attorney fees, and paralegal training costs. At the hearing, petitioner re-quested that she be assessed this loan and the court complied.

In the final judgment, the trial court indicated some doubt as to whether this loan needed to be repaid, stating "[a]lthough petitioner is receiving a lesser amount of net marital property, a majority of her debt is to her parents and family members, which may or may not be repaid."

Despite her previous request that she be assessed the loan, petitioner argues this loan is marital debt that should be shared by the parties. Petitioner argues it is not equitable for her to have to pay this loan and the three credit cards in her name that were not included in the judgment and be credited with the three empty ING accounts that she used per court order for her and the children's support.

### 3. Maintenance

Petitioner argues the maintenance amount did not account for her need to work part time to fulfill her role as a parent or account for respondent's financial superiority. Also, the trial court did not consider COBRA for health insurance for petitioner. Further, the maintenance is inappropriate because of the overall inequitable property division. Finally, petitioner argues that the $200 a month in permanent maintenance was insufficient as it was not ordered retroactive to the date of the petition.

### 4. Child Support

Petitioner argues that the child support should have

been ordered retroactive with credit for any amounts paid.

## 5. Attorney Fees and GAL Fees

The trial court ordered respondent pay $4,305.58 of petitioner's attorney fees. This was the amount of outstanding legal fees at the time of the hearing. Petitioner spent over $31,000 in attorney fees. Most of petitioner's fees were paid by the loan from petitioner's parents. Petitioner claims because respondent caused the fees with his constant arguing, and because of respondent's financial means, he should be required to contribute a greater percentage. Finally, petitioner argues respondent caused the need for GAL fees, so respondent should have to pay a greater portion.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand for a new trial on the issues of property division and maintenance.

Reversed and remanded.

MYERSCOUGH, J., concurs.

McCULLOUGH, J., dissents.

JUSTICE McCULLOUGH, dissenting:

I respectfully dissent. As the trial court found in the order on the motion to reconsider:

"This was a highly litigated case. At the time of the final hearing, Petitioner was on her second lawyer (third currently) and Respondent after using three different lawyers elected to proceed pro se. Throughout the proceedings Petitioner had difficulty obtaining Respondent's financial information and Respondent was once found in contempt for failure to comply with discovery. Early on in the proceeding, Respondent took the position the documents were not required to be provided because of a German pre-marital agreement, or the materials were previously provided to Petitioner in digital form. During the pendency of the proceeding, Petitioner's attorney refused to discuss with Respondent values and valuation dates as prior meetings had digressed into emotional tyraids [sic] against Petitioner's character. As a result, Petitioner instructed her attorney to refuse to discuss the case with Re-

- 25 -

spondent unless Respondent agreed to pay for her attorneys fees. Based on the Court's own observations of the parties, a meaningful meeting between the parties was impossible, and as a result, this Court waived the requirement of a four-way meeting as required by the Court's pretrial order. At the hearing on remaining issues, Petitioner's values and valuation dates were used and although this Court acknowledges errors in those values, Petitioner's objection to the valuation and valuation dates are therefore waived. Also, due to the parties' refusal to cooperate in establishing values and Respondent's reluctance to comply with discovery requests, this Court is not convinced it would receive any better values then previously received. At the hearing on the Motions to Reconsider, Petitioner was unable to assure the Court she would be able to obtain more accurate values from Respondent."

As is apparent, this case was a nightmare for the trial judge. He spent considerable time trying to resolve the issues between the parties, and his decision should be affirmed.